# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2017AP1518-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>　　　　　Plaintiff-Appellant-Petitioner,<br>　　　v.<br>Jessica M. Randall,<br>　　　　　Defendant-Respondent. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 383 Wis. 2d 602,918 N.W.2d 128
(2018 – unpublished)

| | |
|---|---|
| OPINION FILED: | July 2, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 18, 2019 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| 　COURT: | Circuit |
| 　COUNTY: | Dane |
| 　JUDGE: | Nicholas McNamara |

| | |
|---|---|
| JUSTICES: | |
| 　CONCURRED: | ROGGENSACK, C.J. concurs, joined by ZIEGLER, J. and DALLET, J. (opinion filed). |
| 　DISSENTED: | A.W. BRADLEY, J. dissents (opinion filed). |
| 　NOT PARTICIPATING: | ABRAHAMSON, J. withdrew from participation. |

ATTORNEYS:

For the plaintiff-appellant-petitioner, there were briefs filed by *Michael C. Sanders*, assistant attorney general, with *Brad D. Schimel*, former attorney general, on the initial brief and *Joshua L. Kaul*, attorney general, on the reply brief. There was an oral argument by *Michael C. Sanders*.

For the defendant-respondent, there was a brief filed by *Adam M. Welch* and *Tracey Wood & Associates*, Madison. There was an oral argument by *Adam M. Welch*.

**2019 WI 80**

No. 2017AP1518-CR
(L.C. No. 2016CT1061)

STATE OF WISCONSIN        :        IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Appellant-Petitioner,**

  **v.**

**Jessica M. Randall,**

      **Defendant-Respondent.**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**JUL 2, 2019**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1 DANIEL KELLY, J. A police officer arrested Jessica M. Randall for operating a motor vehicle while under the influence of an intoxicant. Ms. Randall gave the officer permission to take a sample of her blood for the purpose of determining its alcohol concentration. But before the Wisconsin State Laboratory of Hygiene could test it, she sent a letter revoking the consent she had previously given. The letter also demanded the immediate return or destruction of her blood sample. This, she says, made the subsequent test of her blood

sample a violation of her constitutional right to be free of unreasonable searches and seizures. We do not agree, and so we reverse the decision of the court of appeals.[1]

## I. BACKGROUND

¶2 After arresting Ms. Randall for operating a motor vehicle while under the influence of an intoxicant, the police read her a document entitled "Informing the Accused" (the "Form").[2] The Form, in pertinent part, asks: "Will you submit to an evidentiary chemical test of your blood?" Ms. Randall consented, and the officer marked the Form accordingly. An hour later, a medical professional withdrew a sample of her blood.

¶3 Two days later (and before her blood sample was tested), Ms. Randall (through her counsel) sent a letter to the Wisconsin State Laboratory of Hygiene (the "Laboratory")

---

[1] This is a review of an unpublished opinion of the court of appeals, State v. Randall, No. 2017AP1518-CR, unpublished slip op. (Wis. Ct. App. June 14, 2018), which affirmed the Dane County Circuit Court, the Honorable Nicholas McNamara, presiding.

A majority of the court agrees with the mandate in this matter, but not the reasoning. This is the lead opinion; other members of the court will express their reasoning in separate opinions.

[2] "[T]he Informing the Accused form is mandated by Wis. Stat. § 343.305(4), and informs the driver that he or she has been arrested for drunk driving; that law enforcement wants to take a sample of his or her breath, blood or urine to determine the alcohol concentration in the driver's system; that refusal to submit to the test will result in negative consequences; and, the driver may take additional tests after completing the first test." State v. VanLaarhoven, 2001 WI App 275, ¶8 n.3, 248 Wis. 2d 881, 637 N.W.2d 411.

"revok[ing] any previous consent that she may have provided to the collection and analysis of her blood, assert[ing] her right to privacy in her blood, and demand[ing] that no analysis be run without a specific authorization . . . ." The letter further said Ms. Randall "does not consent to any person or entity retaining possession of her blood sample, and therefore demands that it be returned to her or destroyed immediately."

¶4 The Laboratory responded to Ms. Randall's letter with one of its own, in which it advised that it required authorization from the entity submitting the specimen (i.e., the Fitchburg Police Department) to release the requested sample. It did not, however, address the issue of consent. The Laboratory then proceeded to test the specimen, which revealed a blood-alcohol level of 0.210 grams of ethanol per 100 milliliters of her blood. It was unlawful for Ms. Randall to operate a motor vehicle with a blood-alcohol level of 0.08 or more.

¶5 The Dane County District Attorney's Office charged Ms. Randall with operating a motor vehicle while intoxicated (in violation of Wis. Stat § 346.63(1)(a) (2017-18)),[3] and operating a motor vehicle with a prohibited alcohol concentration (in violation of § 346.63(1)(b)), both as a third offense. Ms. Randall filed two motions to suppress the results of the blood test. In one, she argued that the consent she gave before the

---

[3] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

blood draw was not free, intelligent, unequivocal, and specific. The circuit court ruled against her, and she did not pursue that issue in the court of appeals or here. In the other motion, she argued that the blood test comprised an unlawful search under the Fourth Amendment because she had revoked her consent before the Laboratory conducted the test. The circuit court agreed, concluding that Ms. Randall's revocation of consent left the State with no constitutionally sufficient basis for discovering the amount of alcohol in her blood sample. The State appealed the circuit court's decision granting the motion to suppress.

¶6 Based on the rationale of State v. VanLaarhoven, 2001 WI App 275, 248 Wis. 2d 881, 637 N.W.2d 411, and State v. Wantland, 2014 WI 58, 355 Wis. 2d 135, 848 N.W.2d 810, the court of appeals affirmed, reasoning that the Laboratory unconstitutionally tested Ms. Randall's blood. State v. Randall, No. 2017AP1518-CR, ¶13, unpublished slip op. (Wis. Ct. App. June 14, 2018). We granted the State's petition for review, and now reverse the decision of the court of appeals and remand this cause to the circuit court for further proceedings consistent with this opinion.

## II. STANDARD OF REVIEW

¶7 Review of an order granting a motion to suppress evidence presents a question of constitutional fact. State v. Delap, 2018 WI 64, ¶26, 382 Wis. 2d 92, 913 N.W.2d 175 (quoting State v. Robinson, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463). In considering such questions, we uphold a circuit court's findings of historical fact unless they are clearly

4

erroneous. State v. Iverson, 2015 WI 101, ¶18, 365 Wis. 2d 302, 871 N.W.2d 661 (quoting Robinson, 327 Wis. 2d 302, ¶22). But we apply the relevant constitutional principles to those facts de novo. State v. Hogan, 2015 WI 76, ¶32, 364 Wis. 2d 167, 868 N.W.2d 124 (citing State v. Martwick, 2000 WI 5, ¶18, 231 Wis. 2d 801, 604 N.W.2d 552).

### III. ANALYSIS

¶8 Ms. Randall asks us to declare that, when a suspect consents to a blood test for the purpose of determining the amount of alcohol it contains, she may prevent the State from obtaining that information by withdrawing her consent subsequent to the blood draw but before the laboratory conducts the test. The facts of the case, so far as they are relevant to this issue, are uncontested. Therefore, our analysis focuses on how the Fourth Amendment of the United States Constitution, and Article 1, § 11 of the Wisconsin Constitution, apply to them.

¶9 We begin where one must always begin in assessing constitutional claims——with the text of the documents. The Fourth Amendment guarantees the following:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Wisconsin Constitution uses almost identical language:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

Wis. Const. art. 1, § 11. Because of the near equivalence of the language, we generally understand Article 1, § 11 of the Wisconsin Constitution to provide the same constitutional protections as the Fourth Amendment of the United States Constitution. State v. Kramer, 2009 WI 14, ¶18, 315 Wis. 2d 414, 759 N.W.2d 598; see also State v. Dearborn, 2010 WI 84, ¶14, 327 Wis. 2d 252, 786 N.W.2d 97. Consequently, when we refer to the Fourth Amendment's requirements, we should be understood as referring to the requirements of Art. 1, § 11 of the Wisconsin Constitution as well.

¶10 The Fourth Amendment's reference point with respect to searches and seizures is reasonableness. Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness[.]'"). The general rule is that searches and seizures conducted without a warrant are not reasonable. Riley v. California, 573 U.S. 373, 382 (2014) ("In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."). One of the exceptions to the warrant rule is that an individual's consent to the search satisfies the constitutional "reasonableness" requirement. "It is well established that a search is reasonable when the subject consents . . . ." Birchfield v. North Dakota, 136 S. Ct. 2160, 2185 (2016);

6

Thompson v. State, 83 Wis. 2d 134, 139, 265 N.W.2d 467 (1978) ("Some of the exceptions [to the constitutional warrant requirement] are consent to search . . . ."); Wantland, 355 Wis. 2d 135, ¶20 ("'[A] search conducted pursuant to a valid consent is constitutionally permissible.'") (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)). If a search is premised on an individual's consent, it must cease immediately upon revocation of that consent. "One who consents to a search 'may of course delimit as [she] chooses the scope of the search to which [she] consents.'" State v. Matejka, 2001 WI 5, ¶37, 241 Wis. 2d 52, 621 N.W.2d 891 (quoting Florida v. Jimeno, 500 U.S. 248, 252 (1991)).

¶11 The court of appeals and the parties each offer us a different paradigm within which to consider the application of these principles to the Laboratory's test of Ms. Randall's blood sample. For her part, Ms. Randall says her encounter with the police resulted in not one, but two discrete searches. The first occurred when a medical technician drew a sample of her blood. The second occurred when the Laboratory tested the sample to determine its alcohol concentration. She argues that both searches must respect the constitutional mandate that she be free of unreasonable searches and seizures. Ms. Randall acknowledges that her consent (as documented on the Form) made the blood draw unobjectionable. But she maintains that her withdrawal of consent made the second search——the Laboratory's analysis of her blood sample——unconstitutional.

7

¶12 The State's paradigm allows for only one search. It says the search started and ended with the medical technician's acquisition of Ms. Randall's blood sample. The subsequent analysis was not a search or seizure, the State says, so there was no Fourth Amendment basis for objecting to the analysis. Consequently, because Ms. Randall did not withdraw her consent until after completion of the search, the State says her revocation was ineffective on the general ground that one cannot revoke consent to something that has already happened. See, e.g., United States v. Mitchell, 82 F.3d 146, 151 (7th Cir. 1996) ("[W]hen a suspect does not withdraw [her] valid consent to a search before the illegal weapon or substance is discovered, the consent remains valid and the seized illegal item is admissible.").

¶13 The court of appeals' paradigm is, in one sense, a portmanteau of the ones offered by the parties. It said there was only one search, but its parameters were more expansive than either of the parties recognized. It understood the search to have been one continuous event that commenced with the blood draw and ended with the Laboratory's analysis. Therefore, the court of appeals said, the Laboratory received Ms. Randall's withdrawal of consent while the search was yet underway. Because the State acknowledged it had no justification for the search other than Ms. Randall's consent, the court of appeals' reasoning required the Laboratory to refrain from testing her blood sample immediately upon receiving her letter. Consequently, because the Laboratory's analysis was not

supported by a warrant or any of the exceptions to the warrant requirement, the court of appeals concluded that the test was an unreasonable search. We will address the paradigms advanced by Ms. Randall and the court of appeals to assess their fidelity to constitutional principles, starting with Ms. Randall's offering.

## A. Two Searches

¶14 Ms. Randall says she was subjected to two searches and that the State must demonstrate a constitutional justification for each one. If we agree with that premise, she says, then we must also conclude the actual analysis of her blood was unconstitutional because she had revoked her consent and the State offered no other basis for satisfying the Fourth Amendment's "reasonableness" requirement. But we do not reach that conclusion because, as explained below, we do not accept her proposition that a blood draw and test involve two searches.

¶15 Ms. Randall begins her argument with an examination of the State's invasions when it set out to discover her blood-alcohol level. She says such proceedings implicate two privacy interests. The first is the obvious—a needle's intrusion to retrieve a sample of blood. The second privacy interest relates to the information contained within her blood sample. She finds support for these dual privacy interests in Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 616 (1989).[4] There, the Court said

---

[4] The dissent believes we (and, apparently, Ms. Randall) erred right here in the beginning of our analysis by confusing "searches" with "seizures":

(continued)

9

The lead opinion initially missteps by failing to ascribe independent constitutional significance to the testing of Randall's blood, conflating the lawful "seizure" of Randall's blood with the "search" conducted through chemical testing. As a result, it collapses the seizure and search into a single constitutional event. Such an error runs counter to the United States Supreme Court's decision in Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 616 (1989).

Dissent, ¶93. This is an odd proposition to ascribe to Skinner, inasmuch as Skinner unequivocally contradicts the dissent on this very point. Skinner says the "seizure" occurs when the suspect is restrained, and the "search" occurs when the State obtains the blood sample:

The initial detention necessary to procure the evidence may be a seizure of the person, if the detention amounts to a meaningful interference with his freedom of movement. Obtaining and examining the evidence may also be a search, if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable[.]

Skinner, 489 U.S. at 616 (emphasis added and internal citations omitted). The Court was really quite clear that obtaining a blood sample is a search: "We have long recognized that a 'compelled intrusio[n] into the body for blood to be analyzed for alcohol content' must be deemed a Fourth Amendment search." Id. at 603 (alteration in original, emphasis added, and quoted source omitted).

(continued)

"it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable. The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested employee's privacy interests." Id. Ms. Randall points out that this is not the only time the Supreme Court has taken note of an individual's privacy interest in the information contained in one's blood. In Birchfield, the Court observed that "a blood test, unlike a breath test, places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading." 136 S. Ct. at 2178. Consequently, "[e]ven if the law enforcement agency is precluded from testing the blood for any purpose other than to measure BAC, the potential remains and may result in anxiety for the person tested." Id. So Ms. Randall concludes that courts have already noted that society is prepared to recognize a legitimate

---

Nonetheless, the dissent insists that our analysis must proceed on the erroneous belief that obtaining a blood sample is a seizure, not a search. It says "[t]he lead opinion arrives at its flawed conclusion by conflating the 'seizure' of Randall's blood, which was accomplished lawfully, with the 'search' conducted through chemical testing. As a result, it collapses the seizure and search into a single constitutional event. This flawed construct permeates and compromises its analysis." Dissent, ¶80; see also id., ¶98 ("The distinction between the initial seizure and the analysis of the seized material is a key one, yet the majority treats the two discrete events as one continuous 'search.'"). The dissent cites no authority for these contra-Skinner propositions, and so we will not address them further.

11

expectation of privacy in the information contained in one's blood.[5]

¶16 Ms. Randall notes that, by definition, a governmental invasion of a person's legitimate expectation of privacy is a "search" for Fourth Amendment purposes. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984) (footnote omitted). Every such search, of course, must have a constitutional justification. But as both Skinner and Birchfield demonstrate, the Court's analytical approach proceeds with the understanding there is only one search, even though the government is both: (1) obtaining a biological specimen; and (2) testing the specimen for the presence of alcohol. Thus, the Skinner Court referred to a blood draw and test as involving a single search: "We have long recognized that a 'compelled intrusio[n] into the body for blood to be analyzed for alcohol content' must be deemed a Fourth Amendment search." Skinner, 489 U.S. at 616 (alteration in original; quoted source omitted). Although the Court recognized

---

[5] Justice Ann Walsh Bradley points out, correctly, that society is not only prepared to recognize a legitimate expectation of privacy in one's medical information, it has actually codified it. Dissent, ¶101. For example, the Health Insurance Portability and Accountability Act ("HIPAA") created significant safeguards protecting the confidentiality of health records. Wisconsin has done so as well. See Wis. Stat. § 146.82. Although neither of these statutory provisions control the disposition of this matter, they do tell us that any analysis that does not account for the privacy interests they reflect is necessarily incomplete.

in this sentence both the acquisition of the sample and the subsequent analysis, the entirety of the Court's reasoning depended on there having been just one search. If the biological specimen testing regimen in Skinner involved an invasion of two distinct privacy interests, the Court would have been duty-bound to assess the constitutional fidelity of each search separately. It did not. Instead, it focused exclusively on the acquisition of the sample to be tested. After the Court satisfied itself that the government had a constitutionally-sufficient basis for obtaining the biological specimens, it declared the testing regime sound.[6]

¶17 Similarly, Birchfield does not support Ms. Randall's assertion that a blood draw and subsequent test involve two searches. One need only consider the Court's disparate treatment of the blood draw and the subsequent test to see that it did not treat the latter as a separate search. The Court explicitly called out a blood draw and administration of a breath test as searches: "The [Fourth] Amendment thus prohibits 'unreasonable searches,' and our cases establish that the taking of a blood sample or the administration of a breath test is a search." Birchfield, 136 S. Ct. at 2173. Nowhere, however, did

---

[6] The Court's grammar also signaled it understood itself to be addressing a single search. It said "a Fourth Amendment search" occurs when there is a "'compelled intrusio[n] into the body for blood to be analyzed for alcohol content . . . .'" Skinner, 489 U.S. at 616 (alteration in original; emphasis added).

13

the Court so much as hint that the ensuing test of the blood sample (or the breath collected for the breath test) might be a search. Indeed, even when Birchfield referred to the test, it is apparent from the context that it actually meant the blood draw. Id. at 2184 (emphasis added) ("A blood test also requires less driver participation than a breath test. In order for a technician to take a blood sample, all that is needed is for the subject to remain still, either voluntarily or by being immobilized."). So nothing in the Court's analysis, from its premises to its conclusion, suggests the actual testing of the blood sample was a search. Indeed, the Court treated the discovery of the defendant's blood-alcohol level as a constitutional non-event.

¶18 Although Skinner and Birchfield lie at the foundation of Ms. Randall's argument, it is impossible to escape the significant tension between her position and those authorities. If a blood draw and subsequent analysis constitute two searches, then Skinner and Birchfield erred in failing to independently assess the constitutionality of each one. But if this brace of cases correctly treats only one of these events as a search, then there is something amiss with Ms. Randall's argument. For the following reasons, we conclude that Ms. Randall's conclusion cannot follow from her premises.

¶19 In the ordinary course of events, an individual enjoys both of the privacy interests identified by Ms. Randall——the right to be free from a non-consensual blood draw and the right to keep private the information contained in one's blood. If

14

the State wants to invade those privacy interests, it must do so consistently with the Fourth Amendment's requirements. But the circumstances that gave rise to the testing of Ms. Randall's blood sample were anything but ordinary. She had been arrested for operating a vehicle while under the influence of an intoxicant. The evidence of that offense, and the instrumentality by which she committed it——the alcohol she had imbibed——was hidden in her blood.

¶20 This, then, is the nature of the privacy interest she claims today: She says that, notwithstanding a constitutionally-compliant search (the blood draw), she nonetheless had a legitimate privacy interest in shielding from the State the very evidence for which it was authorized to search. This has never been the law, and her argument fails to account for the age-old principle that an arrest reduces the suspect's privacy interests. "The search incident to arrest exception rests not only on the heightened government interests at stake in a volatile arrest situation, but also on an arrestee's reduced privacy interests upon being taken into police custody." Riley, 573 U.S. at 391. We are mindful of Riley's admonition that "[t]he fact that an arrestee has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely. Not every search 'is acceptable solely because a person is in custody.'" Id. at 392 (quoted source omitted). Consequently, we must now examine

15

the principles that justify incidental searches and determine how they might apply to Ms. Randall's situation.[7]

¶21 The reduction in an arrestee's privacy interests applies specifically to the instrumentalities, evidence, and fruits of crime for which the suspect has been arrested. State v. Stevens, 26 Wis. 2d 451, 458, 132 N.W.2d 502 (1965) ("Within such scope of the search, instruments, evidence, and fruits of the crime for which the defendant was arrested may be searched for and seized."); Chimel v. California, 395 U.S. 752, 762-63 (1969), abrogation on other grounds recognized by Davis v. United States, 564 U.S. 229 (2011) ("When an arrest is made, . . . it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."); Agnello v. United States, 269 U.S. 20, 30 (1925) ("The right without a

---

[7] The concurrence is concerned that we do not account for the fact that this case involves an arrest for intoxicated driving while Riley (and the other cases on which we rely) involve arrests for different crimes:

> [T]he quotes must be understood in the context in which they were made. That is, policies that permitted a search, or set aside evidence obtained, are apparent from the context in which the search occurred. However, here, the lead opinion transplants quotes into an entirely new context without any recognition that the context impacts the meaning of the words chosen.

Concurrence, ¶72. We respectfully disagree. Literally the entire remaining balance of this opinion is dedicated to teasing out the principles that are transportable from one context to another, and explaining why they apply in both contexts.

16

search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody is not to be doubted."); Carroll v. United States, 267 U.S. 132, 158 (1925) ("When a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution.").[8]

¶22 This principle predates both the Wisconsin and United States Constitutions and still obtains today. Over a century ago, the United States Supreme Court observed that "the right on

---

[8] The concurrence suggests that the amount of time between the search and testing of Ms. Randall's blood has some significance to the incidental search doctrine: "Here, the objected-to search to determine the alcohol concentration of Randall's blood sample occurred nine days after her arrest. Therefore, safety of an officer or preservation of evidence of a crime which undergird the cases cited by the lead opinion are not relevant concerns." Concurrence, ¶71. But the lapse of time has nothing to do with this analysis. It is the relationship between the arrest and the evidence found in the incidental search that matters. So long as the scope of the search remains within proper boundaries, a person has no protectable privacy interest in the fruits and instrumentalities of crime the search may reveal. Nor does that privacy interest grow back over time. Whether the State tested Ms. Randall's blood the next day or the next year, her privacy interest in the amount of alcohol it contained would be precisely the same— zero. And it is zero because the alcohol in her blood was the instrumentality of her crime, and her arrest eviscerated her privacy interest in how much was there.

17

the part of the government . . . to search the person of the accused when legally arrested, to discover and seize the fruits or evidences of crime" has been "uniformly maintained in many cases." Weeks v. United States, 232 U.S. 383, 392 (1914) (overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961), and overruled in part by Elkins v. United States, 364 U.S. 206 (1960)). In fact, it said this right has "always [been] recognized under English and American law . . . ." Weeks, 232 U.S. at 392 (emphasis added). We, too, recognize this ancient precept. "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." State v. Sykes, 2005 WI 48, ¶14, 279 Wis. 2d 742, 695 N.W.2d 277 (quoting State v. Fry, 131 Wis. 2d 153, 169, 388 N.W.2d 565 (1986), overruled on other grounds by Dearborn, 327 Wis. 2d 252 (quoting United States v. Robinson, 414 U.S. 218, 235 (1973))).[9]

---

[9] The concurrence says this is an incorrect statement of the law but does not say why. Concurrence, ¶73. If it is incorrect, we should overrule it. But then we would have to explain why the United States Supreme Court also got this wrong when it said the exact same thing in 1973 (See United States v. Robinson, 414 U.S. 218 (1973)) and again in 2014 when it quoted itself (Riley v. California, 573 U.S. 373, 384 (2014)), and why we made the same mistake when we repeated this quote in 1986 (State v. Fry, 131 Wis. 2d 153, 169, 388 N.W.2d 565 (1986)). We would also have to give an account of our statements to the same effect in 2006 and 2010. State v. Dearborn, 2010 WI 84, ¶27, 327 Wis. 2d 252, 786 N.W.2d 97 ("[A] search incident to a lawful arrest may be justified when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'") (quoted source omitted); State v. Payano-Roman, 2006
(continued)

18

¶23 If an arrestee may prevent the State from knowing the amount of alcohol in her blood, then all of these cases are wrong and some additional justification is necessary to conduct a blood test. But none of the search-incident-to-arrest cases cited above recognized an arrestee's right to keep the instrumentalities and evidence of crime secret from the police. And Ms. Randall offers no authority to support such a proposition.

¶24 Additionally, if we were to accept Ms. Randall's argument, we would need to explain why a person's privacy interest in her alcohol concentration level varies depending on the type of search the State performs. Birchfield addressed itself to two possible means by which the State may discover the concentration of alcohol in a suspect's blood stream——a breath test and a blood test. The first, it said, could be performed as a categorical matter as a search incident to arrest. Birchfield, 136 S. Ct. at 2184. The impact of that statement on Ms. Randall's argument cannot be overstated. A breath test involves a search (obtaining a sample of the suspect's alveolar breath) from which the State may discover the information Ms. Randall says she may keep to herself (her blood-alcohol level). Id. at 2176-77. Having obtained the breath sample, Ms. Randall's logic would require the State to obtain a warrant (or

_____

WI 47, ¶31, 290 Wis. 2d 380, 714 N.W.2d 548 ("A lawful arrest gives rise to heightened concerns that may justify a warrantless search, including the need to discover and preserve evidence.").

19

satisfy one of the exceptions to the warrant requirement) before reading the results of the test.  But nothing in the Court's analysis could support such a conclusion.  To the contrary, it establishes that, upon arrest for intoxicated driving, the suspect loses any privacy interest she may have previously had in her blood-alcohol level.  And that allows the State to know this information upon no greater showing than a good arrest.  It is, of course, certainly true that the State must comply with constitutional requirements in obtaining the sample to be tested, which is why the Court distinguished between breath and blood tests.  Id. at 2185 ("Because breath tests are significantly less intrusive than blood tests and in most cases amply serve law enforcement interests, we conclude that a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving.").  But that distinction does not, and cannot, affect whether a suspect has a privacy interest in the amount of alcohol in her blood.

¶25 The extent of an arrestee's privacy interest in the amount of alcohol in her blood is not contingent on the method the State uses to obtain that information.  Logic would not allow us to conclude that an arrestee has a privacy interest in her blood-alcohol level when the State performs a blood draw, but not when it performs a breath test.  The method by which an arrestee is searched does not affect the individual's privacy interest in the datum the search reveals.  The arrestee is either entitled to keep that information secret, or she is not. Birchfield teaches us that she is not.

20

¶26 This is in keeping with the general principle that an individual has a reduced privacy interest after arrest, Riley, 573 U.S. at 391, which allows the State to seize the instrumentalities, evidence, or fruits of crime discovered on the arrestee's person without any separate constitutional justification.

> The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody is not to be doubted.

Agnello, 269 U.S. at 30.[10]

### B. One Continuing Search

---

[10] Other jurisdictions have also concluded that an arrestee has no privacy interest in her blood-alcohol concentration level. See, e.g., People v. Woodward, 909 N.W.2d 299, 305 (Mich. Ct. App. 2017) ("[W]e conclude that society is not prepared to recognize a reasonable expectation of privacy in the alcohol content of a blood sample voluntarily given by a defendant to the police for the purposes of blood alcohol analysis."); State v. Fawcett, 877 N.W.2d 555, 561 (Minn. Ct. App. 2016) ("Once a blood sample has been lawfully removed from a person's body, a person loses an expectation of privacy in the blood sample, and a subsequent chemical analysis of the blood sample is, therefore, not a distinct Fourth Amendment event."); State v. Loveland, 696 N.W.2d 164, 166 (S.D. 2005) ("Once a urine sample is properly seized, the individual that provided the sample has no legitimate or reasonable expectation that the presence of illegal substances in that sample will remain private."); State v. Hauge, 79 P.3d 131, 144-45 (Haw. 2003) ("Any legitimate expectation of privacy that the [defendant] had in [her] blood disappeared when the blood was validly seized.") (quoted source omitted).

¶27 Ms. Randall also agrees with the court of appeals' paradigm in which the blood draw and subsequent test are understood to comprise a single, continuing search. Under this construct, the constitutional justification for obtaining the blood sample must persist until the Laboratory completes its test. If the justification fails at any point during that time, so the reasoning goes, the State may not thereafter possess or examine the blood sample for the presence of alcohol. Ms. Randall likens her situation to an individual who grants government agents permission to search her home, but then revokes consent before they are done. The search, she says, must be "terminated instantly upon [the individual's] revocation of consent . . . ." Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999). Because the State lost the only justification it had for possessing her blood sample when she revoked her consent, Ms. Randall says, her specimen thereupon became unavailable for testing.

¶28 The court of appeals adopted this reasoning. It said "this court [referring to its opinion in VanLaarhoven[11]] set the beginning and end points of a search of a person's blood, specifically ruling that the taking and testing of blood comprise one continuous search under the Fourth Amendment." Randall, No. 2017AP1518-CR, unpublished slip op., ¶11. Based on that understanding, it concluded that

_____

[11] 248 Wis. 2d 881.

22

the search of Randall's blood, which comprised both the taking and testing of the blood, had not yet been completed at the time when the officials at the state laboratory possessed Randall's blood but had not yet tested Randall's blood; therefore, before the blood was tested Randall had the right to withdraw her consent to the continuation of that search.

Id., ¶13. We cannot agree with the court of appeals' analysis because its "one continuous search," id., ¶11, paradigm is unalterably in conflict with Schmerber v. California, 384 U.S. 757 (1966).

¶29 We first note that the court of appeals' characterization of the VanLaarhoven holding is insufficiently precise. What VanLaarhoven actually says is "the examination of evidence seized pursuant to the warrant requirement or an exception to the warrant requirement is an essential part of the seizure and does not require a judicially authorized warrant." 248 Wis. 2d 881, ¶16. It then said that a defendant may not "parse the lawful seizure of a blood sample into multiple components, each to be given independent significance for purposes of the warrant requirement." Id. In reaching its conclusion, VanLaarhoven relied on the following observations in United States v. Snyder:

> It seems clear, however, that Schmerber viewed the seizure and separate search of the blood as a single event for fourth amendment purposes. . . . The [Schmerber] Court therefore necessarily viewed the right to seize the blood as encompassing the right to conduct a blood-alcohol test at some later time.

852 F.2d 471, 473-74 (9th Cir. 1988). These statements do not necessarily establish that taking and testing a blood sample comprise a single continuous search. Both the VanLaarhoven and

23

_Snyder_ courts were responding to a defendant's attempt to confer constitutional significance on the blood test by separating it from the search by which the State obtained the specimen. Both courts concluded that defendants cannot multiply the number of constitutionally-significant events by slicing up the timeline and demanding a separate justification for each segment. But just because a blood draw and test do not present multiple such events does not mean the single constitutionally-significant event must necessarily commence with the blood draw and end with the test. The _VanLaarhoven_ court could also be understood as asserting that the one event in need of a constitutional justification is the blood draw, not the test. Its reliance on _Schmerber_ and _Snyder_ suggest this is the proper understanding.

¶30 _Schmerber_ establishes that it is not possible to consider a blood draw and test as part of a single continuing search in need of non-lapsing constitutional justification. The _Schmerber_ Court considered the "exigent circumstances" exception to the warrant requirement in the context of a non-consensual blood test conducted subsequent to arrest for intoxicated driving. 384 U.S. at 770. Like _Birchfield_, the Court concentrated exclusively on whether acquisition of the blood sample was consistent with the Fourth Amendment. That is, it did not inquire into whether the justification for taking the sample still obtained when the State tested it. This is especially important to our analysis here because, of course,

the exigency that justifies a non-consensual blood draw never persists beyond the point the State acquires the sample.[12] If the court of appeals is correct, this means that whenever the State's only basis for obtaining the blood sample is an "exigent circumstance," it never has a Fourth Amendment justification for the subsequent test. Therefore, if the blood draw and subsequent test comprise one continuous search, then all such tests must be unconstitutional—according to the court of appeals' analysis—because the justification for obtaining the blood sample lapses immediately after the blood draw.

¶31 But the Schmerber court saw no constitutional violation when the State tests a sample of blood obtained under exigent circumstances. It is possible the Court's holding reflects an understanding that a blood draw and test do not comprise one continuous search. It is also possible the Court's analysis represents a failure to accurately perceive "the beginning and end points of a search of a person's blood[.]" Randall, No. 2017AP1518-CR, unpublished slip op., ¶11. We

---

[12] One element of the exigency analysis is the body's constant metabolization of alcohol in the blood stream, a process that will continue until it is all eliminated. Once the blood is withdrawn, however, the metabolization process stops, which means the amount of alcohol in the blood sample will thereafter remain. United States v. Snyder, 852 F.2d 471, 473 (9th Cir. 1988) ("Removal of blood from a defendant's blood stream eliminates immediately the danger that evidence of blood-alcohol content will be lost."). As this case itself demonstrates, the Laboratory tested the blood sample several days after it was acquired with no apparent diminution in its ability to determine the amount of alcohol therein.

25

conclude the first is the more reasonable conclusion.  We are not the only ones to do so.  See, e.g., Synder, 852 F.2d at 474 ("[S]o long as blood is extracted incident to a valid arrest based on probable cause to believe that the suspect was driving under the influence of alcohol, the subsequent performance of a blood-alcohol test has no independent significance for fourth amendment purposes, regardless of how promptly the test is conducted.").  In fact, we are aware of no court (other than the circuit court and court of appeals in this case) to have ever concluded otherwise.

¶32 The lesson we must draw from Schmerber is obvious. The constitutional basis for obtaining the blood sample both there and here was evanescent.  The exigency supporting the blood draw in Schmerber vanished just as surely (if more quickly) than Ms. Randall's consent here.  In both cases, the authorities tested the samples in the absence of the circumstances that made the blood draws compliant with the Fourth Amendment.  With respect to the question before us today, there is no constitutionally significant distinction to be drawn with Schmerber.  Therefore, if the State of California may test Mr. Schmerber's blood sample when the justification for obtaining it had passed, then the State of Wisconsin may test Ms. Randall's blood sample upon the same rationale.  And the rationale is that a blood draw and test do not represent a single continuous search.  What Schmerber concluded implicitly, Johnson v. Quander, stated explicitly:  "[A] 'search' is

completed upon the drawing of the blood . . . ." 440 F.3d 489, 500 (D.C. Cir. 2006). We agree.

### C. Of Smart Phones and Blood Samples

¶33 Ms. Randall argues that her circumstances are analogous to those at issue in Riley and require suppression of the blood test results for the same reason the Supreme Court suppressed the information discovered in a smart phone. Although there are some similarities between the two situations, they do not suggest that Riley should govern our conclusion. There, the police arrested Mr. Riley after discovering concealed weapons under the hood of his car. The search incident to his arrest produced a smart phone, which the police proceeded to peruse for useful information. After describing the multitudinous types and amounts of information a smart phone can contain, the Court observed that searching such a device could reveal more information about the suspect than an exhaustive search of the owner's entire house. Riley, 573 U.S. at 396-97. Something similar might be said with respect to the information contained in Ms. Randall's blood—and, in fact, she did. She made the entirely reasonable observation that there resides in her blood "genetic information about ancestry, family connections, medical conditions, [and] pregnancy."

¶34 The similarities between a smart phone and a blood sample in terms of the amount of information they each contain, and the personal nature of that information, are such that we must pay particular attention to what the Supreme Court said about the State's access to it. The Fourth Amendment analysis

27

turns, as Riley recognized, on whether there are principles that can effectively limit the incidental search to that which has an appropriate connection to the arrest. Here, there are two. The first relates to the type of information the State may collect from the blood sample. When a government agent conducts a search pursuant to an individual's consent, the scope of the search may not exceed the individual's authorization. "One who consents to a search 'may of course delimit as [she] chooses the scope of the search to which [she] consents.'" Matejka, 241 Wis. 2d 52, ¶37 (quoting Jimeno, 500 U.S. at 252). The "Informing the Accused" form indicates that Ms. Randall consented to a blood test "to determine the concentration of alcohol or drugs in [her] system." Therefore, the State may test the blood sample only for the concentration of alcohol or drugs.

¶35 The second principle relates to the testing mechanism and its ability to focus on only the sought-after information. Perusing the contents of a smart phone, the Riley court concluded, would be reminiscent of "the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." Riley, 573 U.S. at 403. The Court recognized that there were no practical methods by which the police could limit themselves to reviewing only the information to which an incidental search justifies access. Consequently, such searches may not be conducted without a warrant. But here is where Ms. Randall's

28

situation diverges from Riley. Although her blood contains a wealth of personal information, the tests undertaken by the State reveal only information directly related to the purpose for her arrest, to wit, the presence and concentration of alcohol or other prohibited drugs. If the State could not ascertain that data without also learning genetic information about her ancestry, family connections, medical conditions, or pregnancy, our conclusion would be different. However, nothing in the record suggests that the State's tests result in such generalized rummaging. Therefore, Riley does not suggest that Ms. Randall retains any privacy interest in the amount of alcohol in her blood, so long as the State lawfully obtained the blood sample.

\*

¶36 The authorities support the conclusion we reach today, but logic compels it. Ms. Randall's argument depends on the proposition that she had a privacy interest in the instrumentalities and evidence of crime for which the police were authorized to search. Without such a privacy interest, of course, there can be no search capable of implicating the Fourth Amendment. But if Ms. Randall is right, an entire branch of Fourth Amendment jurisprudence (searches incident to arrest) would come to naught. A hidden bag of white powder discovered on a suspect arrested for possession of drugs, or a secreted gun found on an individual arrested for a shooting death, would each be subject to the arrestee's privacy interest. Without a constitutional justification separate and apart from the one

29

warranting arrest, Ms. Randall's position would prevent the State from chemically testing the suspected drugs or fingerprinting the gun.  That is to say, having discovered the very thing for which it was authorized to search, the State could do nothing with it unless it thereafter obtained a warrant for its examination and use.  The Riley court recognized that searches incident to arrest are justified by the arrestee's reduced expectation of privacy.  And Birchfield confirms that this principle applies in the specific context of intoxicated driving.  Upon her arrest, Ms. Randall's reduced expectation of privacy meant that she could not keep the presence and concentration of alcohol in her blood secret from the police.  So the only relevant question is whether the method by which the State obtained the non-private evidence satisfied the Fourth Amendment's requirements.  Ms. Randall's consent to the blood draw satisfied those requirements, and that left the State free to test the blood sample for the non-private information.

¶37 The concurrence reaches the same conclusion, but in an uncomfortably abbreviated fashion.  It is uncomfortable because it lacks any justification for the conclusion that an individual does not have a privacy interest in the alcohol concentration in her blood.  It simply says there is no such interest.  The abbreviation is also troubling because it contains no limiting principles circumscribing this lack of a privacy interest.  So, for example, nothing in the concurrence would prohibit the State from testing a non-arrestee's blood sample for the presence of alcohol or drugs for no weightier reason than curiosity (so long

30

as it did not violate the constitution in obtaining the sample). And what of blood samples drawn by non-State actors, such as hospitals? If the concurrence's uncabined conclusion is correct, what prevents the State from randomly requesting alcohol and drug concentration tests on blood samples drawn for medical purposes? Certainly nothing in the concurrence would prohibit this. And what about the rest of the treasure trove of information we all carry around with us in our blood? What, in the concurrence's view, protects all of that from the State's curious eyes? The concurrence cursorily says its holding is limited to searches consequent upon arrest for intoxicated driving: "This opinion is confined to blood samples that have been drawn for purposes of alcohol or drug testing subsequent to arrest for driving while intoxicated. It does not address privacy interests that might otherwise attach to testing for other purposes." Concurrence, ¶42 n.1. But not a single sentence in the concurrence explains why the arrest for intoxicated driving has anything to do with Ms. Randall's loss of her privacy interest in the amount of alcohol in her system. If there is a link between the two, the concurrence has not said what it is. This is not "intellectually unfortunate and intentionally misleading," as the concurrence claims. Concurrence, ¶75. It is a simple recognition that the reasoning offered by the concurrence has no bounds, even if the specific conclusion addresses just an arrest for intoxicated driving.[13]

---

[13] The concurrence's conclusion ties the suspect's privacy
(continued)

31

¶38 We believe a person has a privacy interest in the information contained in her blood, including the concentration of alcohol or other drugs, until something happens to limit or eliminate that interest. For the reasons explained above, Ms. Randall lost her privacy interest in the alcohol and drug concentration in her blood when she was arrested for intoxicated driving. The concurrence, for some unexplained reason, says she

interests to the arrest for intoxicated driving, but nothing in its reasoning does. See, e.g., concurrence, ¶55 ("[T]here is no reasonable expectation of privacy in the alcohol concentration of a blood sample that has been voluntarily submitted to police for a blood alcohol testing. The blood sample is seized evidence that will be tested to determine whether a crime was committed."); id., ¶60 ("Just as there was no separate reasonable expectation of privacy in the content of the undeveloped film [in State v. Petrone, 161 Wis. 2d 530, 468 N.W.2d 676 (1991)], there was no separate reasonable expectation of privacy in the alcohol concentration of blood that was voluntarily submitted to the State for testing to determine its alcohol concentration."); concurrence, ¶61 ("Numerous federal and state courts that have addressed this issue have reached the same result, concluding that an individual has no reasonable expectation of privacy in the alcohol concentration of blood that a state has properly seized."); id., ¶63 ("Therefore, contrary to the decision of the court of appeals herein, there is no reasonable expectation of privacy in the alcohol concentration of blood that has been lawfully seized. It is merely evidence to be tested in order to determine whether the operator of a motor vehicle had a prohibited alcohol concentration."); id. ("Therefore, just as the State may analyze a lawfully seized white powdery substance to determine whether the substance is cocaine, United States v. Jacobsen, 466 U.S. 109, 125-26 (1984), so, too, may the State test a lawfully seized blood sample to determine its alcohol concentration. In neither case, does a Fourth Amendment reasonable expectation of privacy affect such testing.").

32

never had such an interest. That is an assertion too broad, too unbounded, to be accepted.

## IV. CONCLUSION

¶39 We conclude that the State performed only one search when it obtained a sample of Ms. Randall's blood and subsequently analyzed it for the presence of alcohol or other prohibited drugs. That single search ended when the State completed the blood draw.[14] We further conclude that, although the State must comply with the Fourth Amendment in obtaining a suspect's blood sample, a defendant arrested for intoxicated

---

[14] The concurrence's author says she does not join this opinion because it:

> loses its constitutional thread in its concern for whether the drawing and testing of the blood sample should be analyzed as one search or two. In actuality, it does not matter. What matters is whether there is a legally protectable privacy interest in the alcohol concentration of a blood sample constitutionally obtained from the operator of a vehicle after arrest for driving while intoxicated.

Concurrence, ¶64 (footnote omitted). This is really just two ways of saying the same thing. If the suspect has no protected privacy interest, there can be no search within the meaning of the Fourth Amendment. But if there is a protected privacy interest, and the State invades it, there has been a Fourth Amendment search. So when we inquired into whether Ms. Randall was subject to one search or two, we were necessarily inquiring into whether the State invaded a protected privacy interest when it tested her blood sample for the presence of alcohol. There was only one search because we concluded the State did not invade a protected privacy interest when it tested Ms. Randall's blood sample for the presence of alcohol, a conclusion shared by the concurrence. Therefore, if we "lost the constitutional thread," then so did the concurrence.

driving has no privacy interest in the amount of alcohol in that sample.  Where there is no privacy interest, there can be no constitutionally-significant search.  Therefore, the State did not perform a search on Ms. Randall's blood sample (within the meaning of the Fourth Amendment) when it tested the sample for the presence of alcohol.  As a result, Ms. Randall's consent to the test in this case was not necessary.  For these reasons, we reverse the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶40  SHIRLEY S. ABRAHAMSON, J., withdrew from participation prior to oral argument.

¶41 PATIENCE DRAKE ROGGENSACK, C.J. (*concurring*). The issue presented by this review is whether a defendant-driver of a vehicle who consented to a blood draw after her arrest for driving while under the influence of alcohol contrary to Wis. Stat. § 346.63(1) can prevent testing of the blood sample for alcohol concentration by "revoking" her consent and invoking the Fourth Amendment's protections against unreasonable searches and seizures.

¶42 I conclude that a defendant who has been arrested for driving while under the influence of alcohol has no reasonable expectation of privacy in the alcohol concentration of the blood sample that has been lawfully seized.[1] Therefore, the subsequent testing of the blood sample to determine its alcohol concentration initiates no Fourth Amendment protections through which a defendant may prevent testing the blood sample by "revoking" consent after the blood has been drawn. Accordingly, I respectfully concur in the result reached by the lead opinion, although I do not join that opinion.

## I. BACKGROUND

¶43 The lead opinion ably sets out the background for this controversy, so I will relate only what is helpful in understanding my discussion that follows. On October 29, 2016, Jessica M. Randall was arrested for operating a motor vehicle

---

[1] This opinion is confined to blood samples that have been drawn for purposes of alcohol or drug testing subsequent to arrest for driving while intoxicated. It does not address privacy interests that might otherwise attach to testing for other purposes.

1

while intoxicated, as a third offense. The arresting officer read Randall the Informing the Accused form as required by Wis. Stat. § 343.305(4), and Randall consented to an evidentiary test of her blood for alcohol and drugs.[2] A sample of Randall's blood was drawn without incident by a trained medical professional. The sample was sealed, marked, and brought to the Wisconsin State Laboratory of Hygiene (the laboratory) for analysis.

¶44 Before the laboratory had analyzed the alcohol concentration of Randall's blood sample, Randall's attorney sent a letter to the laboratory. The letter stated:

> It is my understanding that as of this date a blood sample belonging to Jessica M. Randall has been received but has not yet been analyzed. Jessica M. Randall hereby revokes any previous consent that she may have provided to the collection and analysis of her blood, asserts her right to privacy in her blood, and demands that no analysis be run without specific authorization by a neutral and detached magistrate upon a showing of probable cause and specifying the goal of analysis. State v. Wantland, 255 Wis. 2d 135, 152, 848 N.W.2d 810 (2014), Katz v. United States, 389 U.S. 347, 360-61 (1967). Further, Jessica M. Randall hereby advises the Wisconsin State Laboratory of Hygiene that she does not consent to any person or entity retaining possession of her blood sample, and therefore demands that it be returned to her or destroyed immediately.

---

[2] Wisconsin Stat. § 343.305(4) provides in relevant part:

> You have . . . been arrested for an offense that involves driving or operating a motor vehicle while under the influence of alcohol or drugs . . . .
>
> This law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system.

2

A copy of this letter is directed to the Dane County District Attorney's Office. We request that you consult with that office prior to any analysis of the blood sample.

¶45 The blood sample was not returned to Randall. On November 7, 2016, the laboratory tested the blood sample, which showed that Randall had a blood alcohol level of .210. She was charged with Operating a Motor Vehicle While Intoxicated and Operating With Prohibited Alcohol Concentration, both as third offenses. Wis. Stat. § 346.63(1)(a) and (b).

¶46 Randall moved to suppress the results of the blood test. She argued that through her attorney's letter, she had clearly and unequivocally withdrawn her consent to test her blood for alcohol concentration. She asserted that because consent was the only lawful basis for the State to retain her blood and "search" it for blood alcohol concentration, the State was required to return the sample without testing it once she revoked her consent. The circuit court agreed, and issued an order granting Randall's motion to suppress the blood test results.[3] In an unpublished one-judge opinion, the court of appeals affirmed. State v. Randall, No. 2017AP1518-CR, unpublished slip op. (Wis. Ct. App. June 14, 2018).

## II. DISCUSSION

### A. Standard of Review

¶47 "When we review a decision on a motion to suppress evidence, we uphold a circuit court's findings of historical

---

[3] The Honorable Nicholas J. McNamara of Dane County Circuit Court presided.

3

fact unless they are clearly erroneous." State v. Blatterman, 2015 WI 46, ¶16, 362 Wis. 2d 138, 864 N.W.2d 26 (citations omitted). "[H]owever, the application of Fourth Amendment principles to the facts found presents a question of law that we review independently." State v. Brereton, 2013 WI 17, ¶17, 345 Wis. 2d 563, 826 N.W.2d 369 (citations omitted).

### B. Searches and Seizures

### 1. General principles

¶48 The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. Const. amend. IV. Article 1, Section 11 of the Wisconsin Constitution "is substantively identical, and we normally interpret it coextensively with the United States Supreme Court's interpretation of the Fourth Amendment." State v. Floyd, 2017 WI 78, ¶19, 377 Wis. 2d 394, 898 N.W.2d 560 (citations omitted).[4]

¶49 It is helpful to define a "search" and to distinguish it from a "seizure." "A seizure deprives an individual of 'dominion over his or her person or property,' whereas a search

---

[4] When I refer to the Fourth Amendment, I include Article I, Section 11 of the Wisconsin Constitution as its provisions provide a similar framework in which to discuss Randall's contentions.

4

occurs 'when an expectation of privacy that society is prepared to consider reasonable is infringed.'" Brereton, 345 Wis. 2d 563, ¶23, (citations omitted). For example, police might search a home pursuant to a valid warrant, and seize evidence of criminal activity found during the search. "[S]eizures generally are considered less intrusive than searches," because "a seizure affects only the person's possessory interests," whereas "a search affects a person's privacy interests." Id. (citations omitted).

¶50 Not all searches initiate Fourth Amendment protections. Id., ¶31. A Fourth Amendment search occurs when: (1) the government violates an individual's subjective expectation of privacy, and (2) society recognizes the individual's expectation of privacy as reasonable. Kyllo v. United States, 533 U.S. 27, 33 (2001); State v. Tate, 2014 WI 89, ¶19, 357 Wis. 2d 172, 849 N.W.2d 798.

¶51 "The touchstone of the Fourth Amendment is reasonableness." State v. Tullberg, 2014 WI 134, ¶29, 359 Wis. 2d 421, 857 N.W.2d 120 (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)). For this reason, "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." See, e.g., Tullberg, 359 Wis. 2d 421, ¶29; Jimeno, 500 U.S. at 250. A search conducted without a judicially-authorized warrant is considered to be unreasonable, and therefore prohibited by the Fourth Amendment, unless it falls within one of the "'specifically established and well-delineated' exceptions to

5

the warrant requirement." State v. Hogan, 2015 WI 76, ¶55, 364 Wis. 2d 167, 868 N.W.2d 124 (citations omitted).

¶52 Consent to search is a specifically established and well-delineated exception to the warrant requirement. See id. "The United States Supreme Court has 'long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.'" State v. Wantland, 2014 WI 58, ¶20, 355 Wis. 2d 135, 848 N.W.2d 810 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). For this reason, a warrantless search conducted with a person's consent is constitutional. Wantland, 355 Wis. 2d 135, ¶20; Schneckloth, 412 U.S. at 219.

¶53 A person who has voluntarily consented to a search within the scope of the Fourth Amendment may withdraw that consent at any time during the search by an unequivocal act or statement. See, e.g., Wantland, 355 Wis. 2d 135, ¶33. When consent to search has been withdrawn, the search must stop unless and until some other lawful basis for the search exists. However, an individual may revoke consent only while a search is being conducted. Consent cannot be retroactively "revoked" after the search has been completed. See id., ¶¶20-21.

2. Blood sample taking and testing

¶54 The act of drawing blood from one who has been arrested for driving while intoxicated is a search within the meaning of the Fourth Amendment. The United States Supreme Court has long recognized that "any compelled intrusion into the human body implicates significant, constitutionally protected

6

privacy interests." Missouri v. McNeely, 569 U.S. 141, 159 (2013). The act of drawing blood requires the government to violate "a motorist's privacy interest in preventing an agent of the government from piercing his skin." Id. Because a reasonable expectation of privacy must be violated to draw blood, a blood draw is a Fourth Amendment search. Id. It is also, simultaneously, a seizure of evidence, i.e. that person's blood. State v. Perryman, 365 P.3d 628, 631-32 (Or. Ct. App. 2015).

¶55 However, once the search of the motorist's body has been conducted by lawfully drawing a blood sample, the subsequent testing of the evidence seized to determine its alcohol concentration has no further Fourth Amendment implications. This is so because there is no reasonable expectation of privacy in the alcohol concentration of a blood sample that has been voluntarily submitted to police for a blood alcohol testing. The blood sample is seized evidence that will be tested to determine whether a crime was committed.

¶56 As the court of appeals has explained, determining the blood alcohol concentration of lawfully seized blood is the "examination of evidence seized pursuant to the warrant requirement or an exception to the warrant requirement" and "does not require a judicially authorized warrant." State v. Riedel, 2003 WI App 18, ¶16, 259 Wis. 2d 921, 656 N.W.2d 789; see also State v. VanLaarhoven, 2001 WI App 275, ¶17, 248 Wis. 2d 881, 637 N.W.2d 411 (concluding that chemical testing of

7

lawfully seized blood sample is not "a separate event for warrant requirement purposes").

¶57 The court of appeals' decision in State v. Sumnicht, No. 2017AP280-CR, unpublished slip op. (WI App Dec. 20, 2017), contains instructive reasoning. In Sumnicht, which involved substantially the same factual history as Randall presents, the court of appeals relied on our decision in State v. Petrone, 161 Wis. 2d 530, 468 N.W.2d 676 (1991) and held that the defendant could not revoke her consent after the blood had been drawn. Sumnicht, No. 2017AP280-CR, ¶22.

¶58 In Petrone, police searched a suspect's home pursuant to a valid warrant and seized rolls of film believed to contain illicit photographs of minors. Petrone, 161 Wis. 2d at 538. Police developed the film, which resulted in the defendant being convicted of three counts of sexual exploitation of children. Id. at 538-39. Petrone sought to suppress the photos on the grounds that the police did not have a separate search warrant to develop the film after seizing it. See id. at 544.

¶59 We rejected Petrone's contention that the development of the film constituted a second Fourth Amendment search for which a separate warrant was needed. Id. at 545. In doing so, we said:

> Developing the film is simply a method of examining a lawfully seized object. Law enforcement officers may employ various methods to examine objects lawfully seized in the execution of a warrant. For example, blood stains or substances gathered in a lawful search may be subjected to laboratory analysis . . . . The defendant surely could not have objected had the deputies used a magnifying glass to examine lawfully seized documents or had enlarged a

8

> lawfully seized photograph in order to examine the photograph in greater detail. Developing the film made the information on the film accessible, just as laboratory tests expose what is already present in a substance but not visible with the naked eye. Developing the film did not constitute, as the defendant asserts, a separate, subsequent unauthorized search having an intrusive impact on the defendant's rights wholly independent of the execution of the search warrant. The deputies simply used technological aids to assist them in determining whether items within the scope of the warrant were in fact evidence of the crime alleged.

Id.

¶60 The court of appeals in Sumnicht employed our decision in Petrone and concluded that when the State analyzed the defendant's blood to determine its alcohol concentration, it was merely examining lawfully seized evidence rather than infringing on a separate reasonable expectation of privacy. Sumnicht, No. 2017AP280-CR, ¶22. Just as there was no separate reasonable expectation of privacy in the content of the undeveloped film, there was no separate reasonable expectation of privacy in the alcohol concentration of blood that was voluntarily submitted to the State for testing to determine its alcohol concentration.

¶61 Numerous federal and state courts that have addressed this issue have reached the same result, concluding that an individual has no reasonable expectation of privacy in the alcohol concentration of blood that a state has properly seized. See, e.g., Dodd v. Jones, 623 F.3d 563, 569 (8th Cir. 2010) ("[A] 'search' is completed upon the drawing of the blood . . . . Therefore, once Jones had sufficient grounds to draw blood from Dodd after he was arrested for driving while intoxicated, the subsequent testing of that blood had 'no

9

independent significance for [F]ourth [A]mendment purposes.'") (citations omitted); United States v. Snyder, 852 F.2d 471, 474 (9th Cir. 1988) (holding that when blood is validly seized "based on probable cause to believe that the suspect was driving under the influence of alcohol, the subsequent performance of a blood-alcohol test has no independent significance for [F]ourth [A]mendment purposes"); Harrison v. Comm'r of Pub. Safety, 781 N.W.2d 918, 921 (Minn. Ct. App. 2010) ("[W]hen the state has lawfully obtained a sample of a person's blood under the implied-consent law, specifically for the purpose of determining alcohol concentration, the person has lost any legitimate expectation of privacy in the alcohol concentration derived from analysis of the sample."); People v. Woodard, 909 N.W.2d 299, 305 (Mich. Ct. App. 2017) ("[S]ociety is not prepared to recognize a reasonable expectation of privacy in the alcohol content of a blood sample voluntarily given by a defendant to the police for the purposes of blood alcohol analysis.").

¶62 In reaching the opposite conclusion in the matter now before us, the court of appeals misconstrued VanLaarhoven as holding that the testing of a person's blood is a continuation of the Fourth Amendment search of the person begun by the blood draw. In VanLaarhoven, the defendant voluntarily consented to a blood draw and was convicted of operating a motor vehicle while intoxicated after an analysis of his blood revealed a blood alcohol concentration of 0.173%. VanLaarhoven, 248 Wis. 2d 881, ¶2. VanLaarhoven moved to suppress the results of the blood test because the State did not obtain a warrant to test his

10

blood after the blood draw. Id., ¶3. The court of appeals in VanLaarhoven rejected the defendant's argument that "the chemical analysis of his blood sample is a separate event for warrant requirement purposes" and held that the blood draw encompassed the right to analyze the alcohol concentration of the blood. Id., ¶17.

¶63 The court of appeals in this case erroneously asserted that VanLaarhoven "specifically rul[ed] that the taking and testing of blood comprise one continuous search under the Fourth Amendment." Randall, No. 2017AP1518-CR, ¶11. However, the court of appeals in VanLaarhoven actually held to the contrary. VanLaarhoven explained:

> [T]he examination of evidence seized pursuant to the warrant requirement or an exception to the warrant requirement is an essential part of the seizure and does not require a judicially authorized warrant. Both decisions refuse to permit a defendant to parse the lawful seizure of a blood sample into multiple components, each to be given independent significance for purposes of the warrant requirement.

VanLaarhoven, 248 Wis. 2d 881, ¶16 (citing Petrone, 161 Wis. 2d at 538 and Snyder, 852 F.2d at 472). Therefore, contrary to the decision of the court of appeals herein, there is no reasonable expectation of privacy in the alcohol concentration of blood that has been lawfully seized. It is merely evidence to be tested in order to determine whether the operator of a motor vehicle had a prohibited alcohol concentration. Therefore, just as the State may analyze a lawfully seized white powdery substance to determine whether the substance is cocaine, United States v. Jacobsen, 466 U.S. 109, 125-26 (1984), so, too, may

11

the State test a lawfully seized blood sample to determine its alcohol concentration. In neither case, does a Fourth Amendment reasonable expectation of privacy affect such testing.

### C. Lead opinion

¶64 While I agree with parts of the lead opinion, I do not join it. In my view, the opinion loses its constitutional thread in its concern for whether the drawing and testing of the blood sample should be analyzed as one search or two.[5] In actuality, it does not matter. What matters is whether there is a legally protectable privacy interest in the alcohol concentration of a blood sample constitutionally obtained from the operator of a vehicle after arrest for driving while intoxicated.

¶65 The Fourth Amendment proscribes only unreasonable searches and seizures. Jimeno, 500 U.S. at 250. A Fourth Amendment search occurs when a person's subjective expectation of privacy is infringed and society recognizes that expectation of privacy as reasonable under the circumstances. Kyllo, 533 U.S. at 33; Brereton, 345 Wis. 2d 563, ¶23; Tate, 357 Wis. 2d 172, ¶19.

¶66 Accordingly, the question that we must answer is whether determining the alcohol concentration of lawfully seized blood from one arrested for operating while intoxicated violates a reasonable expectation of privacy. As explained more

---

[5] Lead op., Section A "Two Searches" (¶¶14–19) and Section B "One Continuing Search" (¶¶27–31).

12

completely above, I have concluded that it does not.[6]  Therefore, regardless of whether the testing of the blood sample is characterized as part of one search or as a second search, the testing has no Fourth Amendment implications under the facts of this case.  Kyllo, 533 U.S. at 33; Brereton, 345 Wis. 2d 563, ¶¶32-34; Riedel, 259 Wis. 2d 921, ¶16.

¶67  I also part company with the lead opinion's overly broad application of the search incident to arrest exception to the warrant requirement.[7]  No party argued this theory to us, either in briefs or during oral argument.

¶68  Promoting officer safety and preserving evidence are the policies that underlie the search incident to arrest exception to the warrant requirement.  Chimel v. California, 395 U.S. 752, 762-63 (1969) (explaining that upon arrest, it is reasonable to search the person of a suspect, and the area in his immediate control, to remove any weapons that may endanger

---

[6] My conclusion is bolstered by Wis. Stat. § 343.305, which specifically authorizes law enforcement to request a blood draw upon arresting a driver for operating under the influence, or upon having "reason to believe" the driver has been operating under the influence.  § 343.305(3)(a) & (am).  When an officer requests a blood draw, the driver may refuse.  See § 343.305(4) & (9).  However, refusal of a blood draw carries consequences, including revocation of the driver's operating privilege.  § 343.305(9).

Here, consistent with Wis. Stat. § 343.305, the arresting officer requested a blood draw to test for alcohol and drugs and read Randall the requisite information under § 343.305(4).  Randall had the opportunity to revoke consent prior to the blood draw, but she chose not to do so.

[7] Lead op., ¶¶20-23.

officer safety and to prevent concealment or destruction of evidence of a crime).

¶69 The lead opinion's quotation from Riley v. California, 573 U.S. 373 (2014), seems to drive its expansive conclusion. The lead opinion quotes Riley as deciding that, "[t]he search incident to arrest exception rests not only on the heightened government interests at stake in a volatile arrest situation, but also on an arrestee's reduced privacy interests upon being taken into police custody."[8] Id. at 391. The quoted language is used to build the lead opinion's conclusion that an arrest is sufficient to overcome an individual's privacy interests. However, the question we decide herein is much more nuanced than the lead opinion recognizes.[9]

¶70 For example, a more careful reading and an understanding of the policies that underlie the Riley opinion demonstrate the lead opinion's erroneous use of the quote it chose from page 391. Riley also explains that "[n]ot every search 'is acceptable solely because a person is in custody.'" Id. at 392 (citing Maryland v. King, 569 U.S. 435, 463 (2013) (concluding that when "privacy-related concerns are weighty enough [] the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee"). Riley involved a lawful search of Riley's person, but an unlawful

---

[8] Lead op., ¶20.

[9] Lead op., ¶26.

14

search of a cell phone taken from him at the time of his arrest. Riley, 573 U.S. at 386.

¶71 Furthermore, the cases relied on by the lead opinion involve searches for evidence or weapons on the arrestee's person or within the area from which the suspect may gain control of a weapon at the time of defendants' arrests.[10] Here, the objected-to search to determine the alcohol concentration of Randall's blood sample occurred nine days after her arrest. Therefore, safety of an officer or preservation of evidence of a crime which undergird the cases cited by the lead opinion are not relevant concerns.

¶72 Accordingly, while I agree that quotes from well recognized opinions can be very helpful, the quotes must be understood in the context in which they were made. That is, policies that permitted a search, or set aside evidence obtained, are apparent from the context in which the search occurred. However, here, the lead opinion transplants quotes into an entirely new context without any recognition that the context impacts the meaning of the words chosen. See e.g., State v. Stevens, 26 Wis. 2d 451, 457-58, 132 N.W.2d 502 (1969) (explaining that because the purse of a defendant arrested for disorderly conduct was properly in custody of the police, police were permitted to seize what was in plain sight sticking out of her purse); Chimel, 395 U.S. at 762 (explaining that warrantless search of Chimel's entire house incident to his arrest was

---

[10] Lead op., ¶¶20-23, n.7.

15

illegal because it went well beyond a search for weapons on or near the arrestee that could have affected law enforcement's safety); Agnello v. United States, 269 U.S. 20, 32-33 (1925) (concluding that a warrantless search of home for narcotics incident to arrest was illegal because the search occurred at a location different from the arrest); Carroll v. United States, 267 U.S. 132, 153-55 (1925) (concluding that during prohibition, seizure of liquor in car of transport based on probable cause to believe it contained liquor did not violate the Fourth Amendment's prohibition on unreasonable searches). The examination of Randall's blood sample for its alcohol concentration has nothing to do with evidence of the type or location described in the above cases.

¶73 In addition, the lead opinion's assertion that "[w]e, too, recognize this ancient precept[:] 'A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification'"[11] is an erroneous statement of law because the Wisconsin Supreme Court has never held that "a search incident to the arrest requires no additional justification" in a context similar to that herein presented.

¶74 For its far reaching contention, the lead opinion cites State v. Sykes, 2005 WI 48, 279 Wis. 2d 742, 695 N.W.2d

---

[11] Lead op., ¶22.

16

277. However, Sykes actually decided whether a search of Sykes' wallet conducted prior to arrest was lawful so long as there were grounds to support probable cause to arrest before the search, even if the crime charged was not the crime for which probable cause existed before the arrest. Id., ¶¶23, 24. Sykes has nothing to do with whether Randall has a privacy interest in the alcohol concentration of her blood under the circumstances presented herein.

¶75 And finally, rather than trying to meet the conclusion of this concurrence with reasoned argument, the lead opinion repeatedly and purposefully misstates my conclusion that a defendant who has been arrested for driving while under the influence of alcohol has no reasonable expectation of privacy in the alcohol concentration of the blood sample that has been lawfully seized. This tactic is intellectually unfortunate and intentionally misleading to the reader.

### III. CONCLUSION

¶76 I conclude that a defendant who has been arrested for driving while under the influence of alcohol has no reasonable expectation of privacy in the alcohol concentration of the blood sample that has been lawfully seized. Therefore, the subsequent testing of the blood sample to determine its alcohol concentration initiates no Fourth Amendment protections through which a defendant may prevent testing the blood sample by "revoking" consent after the blood has been drawn. Accordingly, I respectfully concur in the result reached by the lead opinion, although I do not join that opinion.

17

¶77 I am authorized to state that Justices ANNETTE KINGSLAND ZIEGLER and REBECCA FRANK DALLET join this concurrence.

¶78 ANN WALSH BRADLEY, J. *(dissenting).* Without a warrant or a constitutional exception to the warrant requirement, a majority of this court[1] countenances the search of a person's blood by the government. Although set forth in two separate opinions, a majority of the court indicates that this is okay. I call it an unconstitutional violation of the Fourth Amendment.

¶79 According to the lead opinion,[2] once Randall consented to the draw of her blood, she forever gave up her right to object to the government analyzing her blood. In reaching its conclusion, the lead opinion[3] erroneously ascribes no independent constitutional significance to the chemical testing of blood seized by law enforcement.

¶80 The lead opinion arrives at its flawed conclusion by conflating the "seizure" of Randall's blood, which was accomplished lawfully, with the "search" conducted through chemical testing. As a result, it collapses the seizure and

---

[1] Justice Kelly's lead opinion and Chief Justice Roggensack's concurrence both uphold the warrantless testing of Randall's blood.

[2] Although I address the lead opinion, the concurrence suffers from substantially the same infirmities.

[3] The only reference to "lead opinions" in our Internal Operating Procedures (IOPs) states that if during the process of circulating and revising opinions, "the opinion originally circulated as the majority opinion does not garner the vote of a majority of the court, it shall be referred to in separate writings as the 'lead opinion.'" IOP III(G)(4). For further discussion of our procedure regarding lead opinions, see Koss Corp. v. Park Bank, 2019 WI 7, ¶76 n.1, 385 Wis. 2d 261, 922 N.W.2d 20 (Ann Walsh Bradley, J., concurring).

search into a single constitutional event. This flawed construct permeates and compromises its analysis.

¶81 Turning a blind eye to everyday realities, the lead opinion compounds its errors by discounting in this post-HIPAA[4] era, society's reasonable expectation of privacy in the contents of a person's blood. Ultimately, it minimizes the significant privacy interest previously identified by the United States Supreme Court.

¶82 Because I conclude that a person does not lose the reasonable expectation of privacy in the contents of one's own blood after it is seized by law enforcement, the results of the blood test conducted in defiance of Randall's withdrawal of consent must be suppressed.

¶83 Accordingly, I respectfully dissent.

I

¶84 Randall was arrested for operating a motor vehicle while under the influence of an intoxicant. Lead op., ¶2. She consented to a draw of her blood, and a medical professional completed the blood draw. Id.

¶85 However, after the blood was drawn but before the blood was tested, Randall's counsel sent a letter to the State Crime Lab indicating that Randall no longer consented to the

---

[4] "HIPAA" refers to the Health Insurance Portability and Accounting Act of 1996. State v. Straehler, 2008 WI App 14, ¶1 n.1, 307 Wis. 2d 360, 745 N.W.2d 431 (citing Pub. L. No. 104-191, 110 Stat. 1936; 42 U.S.C. § 1320d-6 (2006)). Among other provisions, it sets forth penalties for the wrongful disclosure of individually identifiable health information. 42 U.S.C. § 1320d-6.

testing of her blood. Id., ¶3. Specifically, the letter detailed that Randall "hereby revokes any previous consent that she may have provided to the collection and analysis of her blood, asserts her right to privacy in her blood, and demands that no analysis be run without specific authorization by a neutral and detached magistrate upon a showing of probable cause and specifying the goal of analysis." She further indicated that "she does not consent to any person or entity retaining possession of her blood sample, and therefore demands that it be returned to her or destroyed immediately."

¶86 Despite Randall's withdrawal of consent, the Crime Lab tested and analyzed the blood anyway. Lead op., ¶4. After the test revealed a blood alcohol level of .210 grams of ethanol per 100 milliliters of blood, the State sought to use the blood evidence at trial. Id., ¶¶4-5.

¶87 Randall moved to suppress the blood evidence, arguing that she clearly and unequivocally withdrew her consent for the blood to be tested. She contended that absent consent, no other exception to the warrant requirement applied, necessitating suppression of the evidence.

¶88 Agreeing with Randall and suppressing the blood evidence, the circuit court analogized the blood at issue to a cell phone in the context of Riley v. California, 573 U.S. 373 (2014). It opined, "[w]e are exactly in the situation of the Supreme Court case Riley . . . where the State was in possession of an item that they believed contained evidentiary information that, with probable cause, would show that a crime had been

3

committed or was being committed; and, therefore, were justified in seeking and obtaining a warrant to have the phone searched. That's what we have."

¶89 The circuit court ultimately determined that "as a matter of constitutional law, the defendant . . . did withdraw her consent for the search prior to the blood being tested. . . . She retained the right to withdraw that consent. For the State to be allowed to use that evidence at trial over her lack of consent or to have those test results used without . . . a warrant, and without a constitutional exception to a warrant, violates the Fourth Amendment."

¶90 In the circuit court's view, Randall was not, however, entitled to have the blood returned to her or destroyed: "She cannot withdraw her consent to have the blood taken from her. That was done and over with."

¶91 The State appealed and the court of appeals affirmed, but on different grounds than those relied upon by the circuit court. Rather than using the analogy to Riley, the court of appeals determined that although "the taking and testing of the blood, together, comprise a single search to which constitutional protections attach . . . the search had not yet been completed when Randall withdrew her consent before the blood was tested and, therefore Randall retained her right to withdraw her consent to continuation of that search . . . ." State v. Randall, No. 2017AP1518-CR, unpublished slip op., ¶2 (Wis. Ct. App. June 14, 2018) (citing State v. VanLaarhoven,

4

2001 WI App 275, ¶16, 248 Wis. 2d 881, 637 N.W.2d 411; State v. Wantland, 2014 WI 58, ¶¶33-34, 355 Wis. 2d 135, 848 N.W.2d 810).

¶92 Now reversing the court of appeals, the lead opinion concludes that "the State performed only one search when it obtained a sample of Ms. Randall's blood and subsequently analyzed it for the presence of alcohol or other prohibited drugs. That single search ended when the State completed the blood draw." Lead op., ¶39. Further, it determines that "a defendant arrested for intoxicated driving has no privacy interest in the amount of alcohol in that sample. Where there is no privacy interest, there can be no constitutionally-significant search." Id.

II

¶93 The lead opinion initially missteps by failing to ascribe independent constitutional significance to the testing of Randall's blood, conflating the lawful "seizure" of Randall's blood with the "search" conducted through chemical testing. As a result, it collapses the seizure and search into a single constitutional event. Such an error runs counter to the United States Supreme Court's decision in Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 616 (1989).

¶94 In Skinner, the Supreme Court explained that "[o]ur precedents teach that where, as here, the Government seeks to obtain physical evidence from a person, the Fourth Amendment may be relevant at several levels." Id. Beyond the initial seizure of evidence, "[t]he ensuing chemical analysis of the sample to

5

obtain physiological data is a further invasion of [a person's] privacy interests." Id.

¶95 Mere months ago, the Texas court of criminal appeals[5] addressed a similar issue. In State v. Martinez, the court determined that "the Supreme Court considers the analysis of biological samples, such as blood, as a search infringing upon privacy interests subject to the Fourth Amendment." 570 S.W.3d 278, 290 (Tex. Crim. App. 2019). It founded this conclusion on "Skinner's characterization that chemical analysis was a 'further' invasion of privacy interests and that collection and testing were 'intrusions' (plural) that constituted 'searches' (plural)." Id. (citing Skinner, 489 U.S. at 616-617).

¶96 Yet, the lead opinion gives short shrift to the passages from Skinner that clearly demonstrate that the Court considered the "collection" and "testing" as separate intrusions for Fourth Amendment purposes. The testing is a "further invasion of . . . privacy interests." Skinner, 489 U.S. at 616 (emphasis added).

¶97 The lead opinion instead misreads grammatically a single sentence of the opinion and apparently relies on the Skinner Court's use of the singular definite article "a" to assert that "[t]he Court's grammar also signaled it understood itself to be addressing a single search." Lead op., ¶16 n.6. Such a singular focus fails to see the forest for the trees.

---

[5] The Texas court of criminal appeals is the court of last resort in Texas in criminal matters, and its decisions are appealable to the United States Supreme Court.

6

¶98 Further elucidating the lead opinion's error is the United States Supreme Court's very premise in Riley: "whether the police may, without a warrant, search digital information on a cell phone seized from an individual who has been arrested." 573 U.S. at 378 (emphasis added). The distinction between the initial seizure and the analysis of the seized material is a key one, yet the majority treats the two discrete events as one continuous "search." See lead op., ¶39.

¶99 Contrary to the lead opinion's assertion, the testing of a person's blood is an independent "search." Whether a "search" occurs for purposes of the Fourth Amendment turns on whether the government violates a subjective expectation of privacy that society recognizes as reasonable. State v. Brereton, 2013 WI 17, ¶34, 345 Wis. 2d 563, 826 N.W.2d 369 (citations omitted).

¶100 Under the facts we address here, Randall expressed her subjective expectation of privacy in the contents of her blood by way of her letter to the State Crime Lab. The next question in the analysis is whether society recognizes such an expectation as reasonable. It is plain to me that it does.[6]

¶101 One need look no further than "the existence of federal and state privacy laws governing the disclosure and

---

[6] Like the lead opinion, Chief Justice Roggensack's concurrence determines that "there is no reasonable expectation of privacy in the alcohol concentration of blood that has been lawfully seized." Chief Justice Roggensack's concurrence, ¶63. I disagree with the concurrence for the same reasons I disagree with the lead opinion.

7

transmission of health information, such as HIPAA" as reflective of a societal view that health information is private. Martinez, 570 S.W.3d at 291. It is an everyday reality for people to call a health care provider seeking a loved one's medical test results and to be denied access based on privacy concerns codified in state and federal law. See Wis. Stat. § 146.82; 42 U.S.C. § 1230d-6. This omnipresent practice informs society's reasonable expectation of privacy in blood test results.

¶102 That society recognizes such an expectation as reasonable is further illustrated by the United States Supreme Court's opinions in Riley, 573 U.S. 373, and Birchfield v. North Dakota, 136 S. Ct. 2160 (2016). In Riley, the Supreme Court determined that a warrant is required to search digital information on a cell phone seized from an arrested person. It reasoned:

> Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life[.]' The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple——get a warrant.

Id. at 403 (internal citation omitted).[7]

¶103 At the forefront of the Riley Court's decision were the strong privacy interests inherent in the personal information contained on a cell phone. See id. at 393. It wrote:

> The United States asserts that a search of all data stored on a cell phone is 'materially indistinguishable' from searches of these sorts of physical items. That is like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together. Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse. A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but any extension of that reasoning to digital data has to rest on its own bottom.

Id. (internal citation omitted).

¶104 In my view, the privacy concerns regarding the data on a cell phone apply equally to data that can be gathered from a person's blood. Indeed, the Riley court observed concerns regarding medical information on cell phones as a key part of its rationale in requiring a warrant to search a phone's

---

[7] The Riley court's analysis was founded on whether the search incident to arrest exception applied, but the decision's principles are applicable outside of that context. See Riley v. California, 573 U.S. 373, 401-02 (2014). Indeed, the Court emphasized that an exception to the warrant requirement is necessary to justify a warrantless search of cell phone data. Id. at 402. Such an assertion further supports the conclusion that searching the lawfully seized phone was an independent Fourth Amendment event.

9

contents. Id. at 395-96 ("An Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns——perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD."). The amount of information that can potentially be gleaned from a person's blood is significant and goes beyond mere blood alcohol content.[8] See Birchfield, 136 S. Ct. at 2178.

¶105 Downplaying this concern, the lead opinion asserts that "[a]lthough her blood contains a wealth of personal information, the tests undertaken by the State reveal only information directly related to the purpose for her arrest, to wit, the presence and concentration of alcohol or other prohibited drugs." Lead op., ¶35. However, the United States Supreme Court in Birchfield found it of concern that a blood test "places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading. Even if the law enforcement agency is precluded from testing the blood for any purpose other than to measure BAC, the potential remains and may result in anxiety for the person tested." Birchfield, 136 S. Ct. at 2178.

---

[8] For example, a blood sample contains "private medical facts," including HIV status and whether a person is "epileptic, pregnant, or diabetic." Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 617 (1989).

10

¶106 This consideration is amplified by the fact that a person does not know what information a blood test may reveal, and it could even reveal information not previously known. See Kelly Lowenberg, <u>Applying the Fourth Amendment When DNA Collected for One Purpose is Tested for Another</u>, 79 U. Cin. L. Rev. 1289, 1311 (2011). The majority does not assuage this concern.

¶107 In sum, there exists a reasonable expectation of privacy in the contents of a person's blood regardless of the purpose for which testing is sought. Such an expectation does not disappear after the blood has been seized.

¶108 Under the facts of this case, suppression is appropriate because testing was completed without a warrant and absent any exception to the warrant requirement.[9] After Randall withdrew her consent for the blood to be searched, there existed

---

[9] Such a conclusion does not necessarily mean that Randall is entitled to the return or destruction of a blood sample that was legally seized. The blood sample was properly seized under an exception to the warrant requirement——consent. As the <u>Riley</u> court wrote, "Both [defendants] concede that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant. . . . That is a sensible concession." <u>Riley</u>, 573 U.S. at 388 (citations omitted). Similarly here, the police can seize and secure the blood pursuant to Randall's given consent. In other words, the initial seizure was accomplished pursuant to a valid exception to the warrant requirement and was thus constitutionally permissible.

I agree with the circuit court that "[w]e've got a vial of blood or two vials of blood that an officer, I would expect, has probable cause to believe contains information about a crime; and now, because there is not consent, could ask for a warrant to have that blood searched."

11

no independent legal justification on which to base a warrantless test.

¶109 For the foregoing reasons, I respectfully dissent.