STATE of Wisconsin, Plaintiff-Respondent,

v.

Daniel P. McDONALD, Defendant-Appellant-Petitioner.

Supreme Court

*No. 86–0942–CR. Argued February 3, 1988.—Decided June 16, 1988.*

(Also reported in 424 N.W.2d 411.)

For the defendant-appellant-petitioner there were briefs by *William J. Hayes* and *Zwicky, Hayes & Heiber,* Beloit and *Patrick K. McDonald,* co-counsel, Janesville and oral argument by *Patrick K. McDonald.*

For the plaintiff-respondent the cause was argued by *Steven D. Ebert,* assistant attorney general, with whom on the brief was *Donald J. Hanaway,* attorney general.

WILLIAM G. CALLOW, J.   Daniel P. McDonald seeks review of a published decision of the court of appeals, *State v. McDonald,* 138 Wis. 2d 366, 405 N.W.2d 771 (Ct. App. 1987), dismissing an appeal from a judgment of conviction and an order denying a motion for abatement of the criminal proceedings ab initio by the circuit court for Lafayette county, Judge Ralph Adam Fine presiding.

There are two issues before us on review. First, should criminal proceedings against a defendant abate ab initio when the defendant commits suicide while pursuing postconviction relief? Second, if the doctrine of abatement does not apply when the defendant commits suicide while pursuing postconviction relief, does the failure to abate the proceedings violate the defendant's right to equal protection? We conclude that when a defendant dies while pursuing postconviction relief, regardless of whether death is by suicide or by natural causes, the defendant's right to bring an appeal continues. Contrary to the assertions of the parties, the defendant is neither entitled to abatement of the criminal proceedings ab initio nor barred from pursuing an appeal.

532

Accordingly, we affirm that part of the decision of the court of appeals which affirmed the circuit court's denial of McDonald's motion for abatement, we reverse that part of the decision which dismissed the appeal from the judgment of conviction, and we remand the cause with instructions for the original appeal of the conviction to continue. Because we conclude that a defendant who dies while pursuing postconviction relief, regardless of the cause of death, is not entitled to abatement ab initio, we do not reach the defendant's claim that his right to equal protection has been violated.

The facts before us are not in dispute. On June 22, 1985, Daniel McDonald (McDonald) was charged with first-degree murder. McDonald entered pleas of not guilty and not guilty by reason of mental disease or defect. Following a bifurcated trial, McDonald was found guilty of first-degree murder and was sentenced to life imprisonment.

On October 21, 1985, McDonald filed a notice of intent to pursue postconviction relief. McDonald also filed a motion requesting a copy of the trial transcript. Prior to a final resolution of his appeal, McDonald committed suicide. Following McDonald's death, his attorney filed a notice of motion and a motion requesting (1) an order vacating his judgment of conviction and sentence, and (2) dismissal of the information filed against him.

The circuit court denied McDonald's motion for abatement of the criminal proceedings. According to the court, whether abatement of a criminal proceeding should be granted following a defendant's death pending appeal is a policy question. After noting that there is a strong public policy against condoning suicide, the court concluded that it was inappropriate

to adopt rules which sanction or encourage suicide or which appear to reward suicide. Because abatement in the case before it would appear to sanction suicide, the court concluded that the rule established in *State v. Krysheski,* 119 Wis. 2d 84, 349 N.W.2d 729 (Ct. App. 1984)—the death of a criminal defendant pending direct appeal abates all prior proceedings—should not apply to a case in which the defendant's death is a result of suicide. Accordingly, the court denied McDonald's motion for abatement.

McDonald, by his attorneys, appealed the order denying his motion for abatement and the judgment of conviction. The court of appeals refused to abate the proceedings, holding that it was inappropriate to vacate criminal proceedings when the defendant commits suicide while pursuing postconviction relief. The court also dismissed the appeal from the judgment of conviction, apparently on the grounds that the appeal was moot because there was no interest of the defendant to adjudicate. *McDonald,* 138 Wis. 2d at 370.

According to the court of appeals, the abatement rule adopted in *Krysheski* is inapplicable when the defendant's death is by suicide. The court of appeals reasoned that, absent evidence to the contrary, it is presumed that an individual who commits suicide does so by choice. While recognizing that death pending appeal deprives the defendant of a final determination of an appeal and that justice normally requires abatement of a conviction where the appeal is unresolved, the court concluded that when the defendant prevents a final determination of the appeal by committing suicide, justice does not require abatement. The court of appeals further noted that to permit abatement would justify the public and the

victim, or the victim's family, in believing that the defendant succeeded in vacating the judgment of conviction through suicide when he would have lost the appeal on the merits. *Id.* at 368–69.

In a concurring opinion, Judge Sundby argued that the court should reexamine its holding in *Krysheski* and that the court should not adopt a rule that the death of the defendant abates all proceedings ab initio, regardless of the manner in which the defendant died. Judge Sundby first noted that the historical legal rationale for abating criminal proceedings upon the death of a defendant was based upon the courts' conclusions that, when a financial penalty is imposed upon a defendant, it is unfair to punish the defendant's family by making the family pay the defendant's fine by virtue of an assessment against the estate. He then argued that this rationale is inapplicable when the failure to abate affected only the family. Moreover, because the rule adopted by the majority would be likely to involve the court in exhaustive investigation and litigation concerning the voluntariness of the defendant's death, Judge Sundby advocated instead that the court "adopt a very simple rule covering all deaths pending appeal, i.e., that the appeal is dismissed because the appellant is no longer subject to the jurisdiction of the court." *Id.* at 373 (Sundby, J., concurring).

On September 15, 1987, we accepted McDonald's petition for review.

Prior to this case, we have never addressed the question of whether criminal proceedings should abate ab initio when the defendant dies while pursuing postconviction relief. The court of appeals, however, in *Krysheski,* 119 Wis. 2d at 89, has addressed this issue in the context of a defendant who died of a

heart attack while pursuing an appeal. In *Krysheski,* the court adopted the federal approach to a defendant's death pending appeal and held that, when a defendant dies pending an appeal of right, all prior criminal proceedings are abated.

The court of appeals first noted that, because the issues surrounding a defendant's conviction become moot if the defendant dies pending appeal, dismissal of the appeal was appropriate. The court continued, however, and stated that not only should the appeal be dismissed but also the criminal proceedings should be abated ab initio. According to the court:

> "Abatement of all proceedings is based on the recognition that a defendant pursuing an appeal of right has not yet received all of the safeguards of the judicial system. Death prior to appeal works a deprivation of a final determination of the case's merits. Because an appeal plays an integral part in our system for final adjudication of guilt or innocence, justice requires the abatement of a conviction where the merits of the appeal are left unresolved." *Id.* at 88.

We agree with the *Krysheski* court that an appeal plays an integral part in the judicial system for a final adjudication of guilt or innocence and that a defendant who dies pending appeal should not be deprived of the safeguards that an appeal provides. We disagree, however, that the appropriate remedy is to abate the criminal proceedings ab initio. Instead, we conclude that, when a defendant dies pending appeal, regardless of the cause of death, the defendant's right to an appeal continues.

This court has consistently recognized that a defendant has a constitutional as well as a statutory right to an appeal. Art. I, sec. 21, Wis. Const.; sec.

808.03(1), Stats. This right to an appeal, as *Krysheski* notes, is an integral part of a defendant's right to a final determination of the merits of the case. It serves as a safeguard to protect a defendant against errors in the criminal proceedings. A defendant who dies pending appeal, irrespective of the cause of death, is no less entitled to those safeguards.

Moreover, because collateral proceedings may be affected by criminal proceedings in which it is alleged that an individual took the life of another, it is in the interest of society to have a complete review of the merits of the criminal proceedings. For example, under sec. 852.01(2m)(b), Stats., a final judgment of conviction of felonious and intentional killing is conclusive evidence that the defendant has feloniously and intentionally killed the decedent, and thus the defendant may not: (1) receive money from the victim's estate under the intestacy statute, sec. 852.01(2m)(a); (2) inherit under the victim's will, sec. 853.11(3m); (3) receive any benefit from a contract in which the victim is the obligee and which names the defendant as the beneficiary, sec. 895.43; (4) receive any benefit, as a beneficiary, payable as a result of the death of the victim, sec. 895.435; (5) receive a benefit, as a beneficiary, from a life insurance policy on the life of the victim, sec. 632.485; and (6) receive the victim's interest in property held in joint tenancy, sec. 700.17(2)(b).[1] Because of these potential collateral consequences, it serves the interest of justice to continue the appeal. By continuing the appeal, the

---

[1]The legislature recently affirmed that individuals should not profit by their criminal conduct which causes death and expanded that declaration to include juveniles who are adjudicated delinquent on the basis of unlawfully and intentionally killing a person. 1987 Wisconsin Act 222.

necessity of initiating separate civil proceedings will be eliminated if the judgment of conviction is affirmed. If the judgment of conviction is reversed, the collateral rights may be resolved in a civil proceeding.

Furthermore, if we adopted the reasoning of the court of appeals in the present case and distinguish between death by suicide and death by natural causes, future cases would require the court to examine the circumstances of the defendant's death. Permitting an appeal to continue eliminates the myriad of problems which would arise from requiring courts to determine whether the defendant's death was voluntary or involuntary.

Other jurisdictions, although a minority,[2] have also held that when a defendant dies while pursuing postconviction relief, the appeal should continue. *State v. Jones,* 220 Kan. 136, 137, 551 P.2d 801 (1976); *New Jersey State Parole Board v. Boulden,* 156 N.J. Super 494, 497, 384 A.2d 167 (1978); *Commonwealth v. Walker,* 447 Pa. 146, 147–48 n. *, 288 A.2d 741 (1972). In *Jones,* the Kansas Supreme Court held that the interest of the family of the defendant and the public in the final determination of a criminal case and the fact that collateral rights are often affected by the criminal proceedings warranted the conclusion that the appeal should be adjudicated on its merits, despite the death of the defendant. *Jones,* 220 Kan. at 137.

Similarly, the Pennsylvania Supreme Court in *Walker* rejected the defendant's motion for abatement ab initio and the state's motion for dismissal, conclud-

---

[2]The majority of the jurisdictions addressing this issue conclude that the criminal proceedings should abate ab initio. *E.g., United States v. Moehlenkamp,* 557 F.2d 126, 128 (7th Cir. 1977); *State v. Morris,* 328 So. 2d 65, 67 (La. 1976); *People v. Mazzone,* 74 Ill. 2d 44, 48, 383 N.E.2d 947 (1978).

ing that "it is in the interest of both a defendant's estate and society that any challenge initiated by a defendant to the regularity or constitutionality of a criminal proceeding be fully reviewed and decided by the appellate process." *Walker,* 447 Pa. at 147–48 n. *. We conclude that these decisions articulate the correct rule.

We are not persuaded by the arguments of the parties and the court of appeals that the appeal from the judgment of conviction must be dismissed because the proceedings are moot. As we have noted, society and the deceased have a very real interest in a final determination of the defendant's appeal from the criminal conviction. Under these circumstances, we conclude that McDonald's appeal is not moot.

■

In summary, we hold that, when a defendant dies while pursuing postconviction relief, irrespective of the cause of death, that the defendant's right to an appeal continues. The defendant is not, moreover, entitled to have the criminal proceedings abated ab initio. The holding of the court in *Krysheski*—that the death of a criminal defendant pending direct appeal abates all prior proceedings—is overruled.

■

Because McDonald properly initiated the appellate process prior to his death, he is entitled to a final determination of his appeal. We recognize that the defendant's input into the appeal process is a significant factor, but this consideration is overcome by the fact that the appeal process reviews the appeal based upon the record and cannot be modified by a defendant's action. Accordingly, we remand this cause to the court of appeals with directions to continue McDonald's original appeal from the judgment of conviction.

539

*By the Court.*—The decision of the court of appeals is affirmed in part, reversed in part, and the cause is remanded for proceedings consistent with this opinion.

HEFFERNAN, CHIEF JUSTICE (concurring). I join in the opinion of the court but concur specially to respond to the dissent.

It may well be, as the dissent suggests, that the defendant in this case is in the hands of God. However, the responsibility for resolving the legal uncertainties left behind is squarely in the hands of this court. It is no answer to that responsibility to abdicate our judicial duty to another power. Indeed, it would be a violation of our oath to administer justice to do so.

We operate in a constitutional society, with a "wall of separation between church and state."[1] In this case, that wall fences us on the side of the living and charges us with responsibility for determining whether legal error was made in the trial of Daniel P. McDonald (McDonald). It is not his appeal which is moot, as the dissent would have it, but rather it is his death which is moot, because he did not take the potential errors of our justice system into the grave with him.

These potential errors remain behind to perplex and confound his relatives, friends, reputation, and the legal system. Indeed, an important point of the majority opinion is that these errors remain behind to worry society at large, because such important collateral matters as inheritance, insurance benefit distribution, and distribution of various property may wind

---

[1] Thomas Jefferson, Reply to Messrs. Dodge et al., letter of January 1, 1802, collected in Padover, *The Complete Jefferson,* 518–19.

up being conclusively determined without benefit of a review for error in the potentially controlling criminal action.[2]

For these reasons, I suggest that the dissent suffers from a lack of focus. This court seeks not to extend its grasp "from here to eternity," but to discharge its duty in the here and now of civil society in order to unravel the potential legal problems caused by McDonald's death pending appeal.

DAY, J. (dissenting). The majority opinion has now extended this court's jurisdiction over criminal defendants beyond the grave. Its appellate grasp now reaches "from here to eternity!"

But the grave should end this court's involvement with the defendant. We trust the defendant—and his victim—are in the hands of one whose judgments "are true and righteous altogether." Our judgments, even at their best, are but imperfect reflections of absolute justice. We should recognize that the death of Judge McDonald ended this court's role in this matter. This case should be dismissed as moot.

Judge McDonald was convicted of first degree murder for the killing of the young law partner of the man who had recently defeated Judge McDonald in his re-election bid for Circuit Court Judge of Lafayette

---

[2]Further, the dissent's point regarding the relevance of such collateral matters as inheritance to the facts of this case is unclear. Dissent, at 543–544. Does the dissent mean to imply that one rule should apply when collateral matters are at issue and another when collateral matters are not at issue? This would be tantamount to allowing or disallowing a right of appeal based on the identity of the victim—a novel approach which surely should be rejected.

county. Judge McDonald committed suicide in prison after starting an appeal of his conviction.

The majority of this court has decided that the appeal should proceed in spite of the fact the he is dead by his own hand. The theory is that the dead or those who survive them should have the opportunity for "vindication" by allowing an appeal of his conviction to go forward. But for what purpose?

The most that could happen would be that a majority might hold an error occurred in the trial warranting a new trial. Does that "vindicate" the deceased? Hardly. There is not going to be a determination that the deceased was "not guilty." That issue will never be retried. The majority opinion might make sense if it held that if a new trial was granted to the deceased, he would be retried "in absentia." That isn't going to happen. The law provides that deceased persons may be plaintiffs or defendants by their personal representatives so that resolution of such issues as their negligence or culpability for fraud or theft resulting in civil liability may proceed and their ultimate "vindication" or "condemnation" can begin, be tried, appealed, and if prejudicial error is found, reversed and be tried over again. But it is obvious that this court is not prepared to hold that this should be done with deceased criminal defendants.

The majority opinion (at 551) cites various statutes that adversely affect the right of an intentional felonious killer to profit from the death of his victim.

The principal statute in sec. 852.01(2m) which reads as follows:

"852.01 Basic rules for intestate succession ....
(2m) REQUIREMENT THAT HEIR NOT HAVE INTENTIONALLY KILLED THE DE-

**CEASED.** (a) If any person who would otherwise be an heir under sub. (1) has feloniously and intentionally killed the decedent, the net estate not disposed of by will passes as if the killer had predeceased the decedent.

"(b) A final judgment of conviction of felonious and intentional killing is conclusive for purposes of this subsection. In the absence of such a conviction, the court, on the basis of clear and convincing evidence, may determine whether the killing was felonious and intentional for purposes of this subsection.

"(c) This subsection does not affect the rights of any person who, before rights under this subsection have been adjudicated, purchases for value and without notice from the killer property that the killer would have acquired except for this subsection; but the killer is liable for the amount of the proceeds. No insurance company, bank or other obligor paying according to the terms of its policy or obligation is liable because of this subsection unless before payment it has received at its home office or principal address written notice of a claim under this subsection."

Each of the statutes cited in addition to the above, i.e., secs. 853.11(3), 895.43, 895.435, 632.485, 700.17(2)(b) all provide: "Section 852.01(2m)(b) and (c) applies to this section" (or "paragraph").

In any of the statutory possibilities if the time for appeal had expired, the convicted one could not profit from his victim's death. If, however, an appeal had been started and the killer died prior to the appeal determination no "presumption" as to his guilt or innocence would be effective and that issue would be tried under any of the cited statutes in a civil court.

There the burden of proving intentional felonious killing under sec. 852.01(2m)(b), Stats., is "clear and convincing evidence" *not* "beyond a reasonable doubt" as in a criminal case. Thus, even if an appellate court found there was not sufficient evidence to convict the defendant beyond a "reasonable doubt" and reversed the conviction and dismissed the criminal charge, *the case would still go to trial as a civil case under sec. 852.01(2m)(b), Stats.!*

This shows the futility of the procedure the majority adopts today. It does nothing.

In the case before us there is no claim that Judge McDonald stood to profit from his victim's death. Thus *there is absolutely nothing to be gained by the procedure adopted by the majority today.*

The better rule is that in criminal cases death moots the matter at whatever stage of the proceedings it occurs. If a person is charged and dies before coming to trial that ends the matter; it is moot.

If a person is in the process of being tried and dies, the trial should end. The possibility of a finding of guilt or innocence is ended. It's moot; it's over. No matter how insistent those near and dear to the accused might be in demanding that the trial proceed, and claim that proof could be offered to vindicate the accused, the trial cannot go forward without the criminal defendant.

If one convicted took an appeal, won a new trial and died before the trial could take place, the matter would be moot and what might have happened in a new trial will forever remain unknown.

So it should be with the proceedings here before us, where an appeal was initiated in time but the convicted defendant died before the appeal was heard. The matter should be treated the same as in the

hypothetical situations illustrated above—it should be recognized as moot.

Suppose a defendant, represented at trial by the public defender, was convicted and then the public defender filed an appeal. Further suppose the defendant died before the appeal was heard. Further suppose the deceased defendant had no relatives, no personal representative, because he owned no property, and no "friends." What should be done? Is the public defender to be ordered at public expense to proceed with the appeal to "vindicate" the deceased? To ask the question seems to point up the absurdity of the rule adopted today by the majority. Any interest "society" might have in the matter (Majority opinion at pages 537–539) would be better served by declaring such a case moot.

There is no end to the slippery slope down which the majority has started to slide. For instance, while there is a limit on appeal time for alleged error at trial, there is no such limit when constitutional error is claimed. Section 974.06, Stats., provides:

> **"Postconviction procedure.** (1) After the time for appeal or postconviction remedy provided in s. 974.02 has expired, a prisoner in custody under sentence of a court claiming the right to be released upon the ground that the sentence was imposed in violation of the U.S. constitution or the constitution or laws of this state, that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"(2)  A motion for such relief is a part of the original criminal action, is not a separate proceeding and may be made at any time ....

"(b)  If it appears that counsel is necessary and if the defendant claims or appears to be indigent, refer the person to the state public defender for an indigency determination and appointment of counsel under ch. 977 ....

"(5)  A court may entertain and determine such motion without requiring the production of the prisoner at the hearing ...."

After the time for appeal is long gone and the defendant is long dead, what stops a relative, or "friend," or anyone else from bringing a sec. 974.06, Stats., motion to set aside the conviction and order a new trial? Under the reasoning of the majority the answer is: "nothing." It could be an interesting "full employment" program for the legal profession to dig up old files from years back and start the process of "vindication" for those long gone to their reward.

Furthermore, this court has already resolved the issue of what to do with a case that involved the vindication of a man's reputation, when he died after his case was briefed and argued in this court but before a decision was mandated. The case is *State ex rel. Steiger v. Eich,* 86 Wis. 2d 390, 272 N.W.2d 380 (1978).

While *McDonald* is a criminal case, the *Steiger* matter involved a John Doe proceeding. A John Doe investigation is about the closest thing to a criminal proceeding that we have without being denominated as such. This proceeding was directed solely against Congressman William A. Steiger and he was the only witness called. Clearly, as a Congressman and as a

citizen, his reputation was "on the line." His refusal to obey an order to name the sources of his information on vote fraud subjected him to possible incarceration.

The case arose because a large number of people involved in the political process in Wisconsin wanted to make it easier for citizens to register to vote. They got legislation passed which established a system of election day registration at the polls. William A. Steiger, a United States Congressman for the Sixth District of Wisconsin and former state legislator, had evinced a longtime interest in these matters. He expressed concern that the system adopted in Wisconsin and being considered by Congress for nation-wide application made voter registration fraud easier and more likely. He publicly stated that three University of Wisconsin students from Madison had visited him in his offices in Washington, D.C. and told him that each had managed to vote twice in the Presidential election of 1976 in Madison. They cited their experience as showing a need for Congress to tighten up the voter registration law which was a "hot" political issue in Congress. Following his revelation of these conversations, Congressman Steiger was asked to reveal the names of the students by the Dane County District Attorney. He refused and claimed it was a privileged communication to him under the Speech and Debate Clause of the United States Constitution.

In a letter to the Congressman from the Dane County District Attorney dated June 1, 1977 (Exhibit L to Steiger Affidavit dated Sept. 28, 1977), the District Attorney said:

> "Again, I find it surprising that a person claiming great concern about voter fraud refuses to cooperate with those charged with the enforcement of the

law. No election law which you might design will protect against voter fraud unless it provides for the prosecution of its violators and unless citizens concerned with the integrity of the electoral process cooperate in its enforcement."

The matter became a political "cause celebre." *The Capital Times* of Madison on May 18, 1977 (Exhibit H to Baldwin Affidavit filed April 28, 1978 in this court), headlined a story, **"Doyle calls vote fraud hearing—Steiger is asked to appear voluntarily."** The story read in part as follows:

"Dane County District Attorney James E. Doyle, Jr. said today he will ask U.S. Rep. William Steiger (R–Oshkosh) to appear voluntarily before a John Doe hearing in Dane County in an investigation of voter fraud allegations made by Steiger ....

"Steiger said this spring in a broadcast interview that he had evidence of voter fraud in Madison, a charge which has been repeatedly made by Republicans but which has never been proved.

"Steiger was one of 10 House Republicans who demanded Monday that Milwaukee County District Attorney E. Michael McCann turn over a memorandum which they charged, shows serious potential for vote fraud in the new Wisconsin system which allows voters to register at the polls.

"The demand by Republicans is seen as a move to discredit President Jimmy Carter's proposed legislation to pattern national voter registration laws after Wisconsin's system ....

"Doyle requested the John Doe hearing after Steiger repeatedly refused to turn over the names of the three persons who allegedly admitted to him

they had voted more than once during the 1976 presidential election ....

"A John Doe hearing, under state law, can be called to investigate possible wrong-doing, but does not necessarily mean a crime has been committed ....

"Doyle said the alleged violations are felonies under Wisconsin law, ..."

Following correspondence between the City Clerk, the District Attorney and the Congressman, Judge William F. Eich commenced the "John Doe" proceeding at the request of the District Attorney. Congressman Steiger was subpoenaed. He appeared and refused to divulge the names of the students who had told him of their double voting under claim of privilege pursuant to the Speech and Debate Clause, Art. I, sec. 6 of the United States Constitution. (Transcript of Proceedings before Judge Eich Aug. 24, 1977, attachment IV to affidavit of Attorney Gordon B. Baldwin filed April 28, 1978.)

On February 28, 1987, Judge Eich issued a Memorandum Decision denying Congressman Steiger's claim of immunity. Among other things the decision said:

"I have determined that his [Steiger's] actions were not speech or debate and that he had no privilege under Art. I, Sec. 6. I thus consider Mr. Steiger's argument as to the chilling effect and his argument on 'federal supremacy' to be without merit.

"I hold, therefore, that Mr. Steiger has no constitutional or other privilege to refrain from answering questions as to the identity of the persons who admitted to him that they had violated the criminal laws of Wisconsin .... [T]he acts admitted to by

the students constitute a felony—a serious offense in Wisconsin—and Mr. Steiger is the only person possessing this evidence. It would be no different in principle if the Congressman's visitors had admitted complicity in several unsolved bank robberies (or murders!) in the State of Wisconsin."

Congressman Steiger through one of his attorneys, Professor Gordon B. Baldwin, of the University of Wisconsin Law School, petitioned this court for a Writ of Prohibition directed against Judge Eich and District Attorney Doyle.

In his Petition for Issuance of a Writ of Prohibition in this court, among the reasons given as to why this court should take the case, the petition stated:

"The Circuit Court's opinion of February 10, 1978, involves questions about the scope of the protections afforded to Members of Congress and the general public by the Speech or Debate Clause (Art. I sec. 6) and First Amendment of the United States Constitution and by the Federal structure of the American government. This Court has not previously answered these questions, which involve sufficient compelling interests to the public to warrant entertainment of this original action ....

"*Irreparable harm to the petitioner* and to the legislative independence of the Congress of the United States will continue if the Circuit Court's decision is not vacated, ..." (Petition, p. 2.) (Emphasis added.)

In his *Memorandum in support of the petition,* p. 17, counsel for Congressman Steiger stated:

"The adverse effects of the ruling below would be felt by Congressman Steiger and by all other members of Congress."

An order to show cause was issued and oral argument took place on June 7, 1978.

On June 8, 1978, this court granted petitioner's request that it take original jurisdiction to consider the merits of the petition "because the case is a matter Publici juris." The case was ordered placed on the court's September, 1978 calendar for On Brief disposition.

Congressman Steiger passed away on December 4, 1978, before this court issued its opinion. On December 22, 1978, this court dismissed the action as moot. This court said at p. 391:

> "Congressman Steiger died on December 4, 1978. A decision on the merits of this dispute can have no practical legal effect upon any existing controversy. The case is therefore moot, ..."

If this court found against him he could have appealed to the United States Supreme Court. If this court had agreed with the Congressman's position, it would have vindicated his judgment and his conception of his proper role as a Congressman and would undoubtedly have provided comfort to his family and friends. That might have been true had he lived, but he died and the right to vindication or condemnation ended with his death. So likewise should the issue in the case before us be resolved. This court should not have one rule for deceased congressmen and another for deceased judges.

The majority have rightly overruled *State v. Krysheski,* 119 Wis. 2d 84, 349 N.W.2d 729 (Ct. App. 1984), which held death voided a conviction from the beginning, i.e., "abated" the entire action. That result, though supported in some jurisdictions, is wrong and the majority rightly overruled it. But the majority is

equally in error in saying an appeal may continue. If the conviction is upheld on appeal, what good does that do the dead man or those who cherish his memory? Better for all concerned if the matter is recognized as moot.

A majority of the present court was also on this court when the *Steiger* case was dismissed. This court should follow the reasoning of its own precedent in *Steiger* and recognize that death has ended the case.

Judge Sundby stated it well in his concurrence in *State v. McDonald,* 138 Wis. 2d 366, 373, 405 N.W.2d 771 (1987):

> "I believe it is better to adopt a very simple rule covering all deaths, pending appeal, i.e., that the appeal is dismissed because the appellant is no longer subject to the jurisdiction of the court."

There is nothing we can do for the deceased. A wise man long ago said of the dead:

> "Their love and their hate and their envy have already perished, and they have no more for ever any share in all that is done under the sun. *Ecclesiastics,* 9:6 (RSV)."

This court should recognize its own logical limitations. It should follow *Steiger* and dismiss this case as moot.