# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:        2022AP882

†Petition for Review Filed

Complete Title of Case:

**STATE OF WISCONSIN,**

    **PLAINTIFF-RESPONDENT,**

    **V.**

**RAYMAND L. VANNIEUWENHOVEN,**

    **DEFENDANT-APPELLANT.†**

| | |
|---|---|
| Opinion Filed: | April 30, 2024 |
| Submitted on Briefs: | March 22, 2023 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Gill, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Ana L. Babcock* of *Babcock Law, LLC*, Green Bay. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Joshua L. Kaul*, attorney general*,* and *Lisa E.F. Kumfer*, assistant attorney general. |

# COURT OF APPEALS
# DECISION
# DATED AND FILED

## April 30, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP882-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF49

**IN COURT OF APPEALS**

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

RAYMAND L. VANNIEUWENHOVEN,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Marinette County: JAMES A. MORRISON, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

¶1    GILL, J.  Raymand Vannieuwenhoven appeals from a judgment convicting him, following a jury trial, of two counts of first-degree murder.[1] *See* WIS. STAT. § 940.01 (1975-76).  Raymand contends that the circuit court erred by denying his motion to suppress the results of a DNA analysis used to match his DNA profile to a DNA profile developed from a 1976 crime scene ("crime scene").  The DNA analysis was conducted after law enforcement had collected Raymand's DNA from an envelope that he licked and voluntarily gave to law enforcement as part of a "ruse."  According to Raymand, he had a reasonable expectation of privacy in his "DNA and the information contained therein," and law enforcement's warrantless searches of his DNA violated his Fourth Amendment rights, regardless of his voluntarily licking the envelope and giving it to identified law enforcement personnel.[2]

¶2    We conclude that law enforcement lawfully seized both the envelope and its contents because Raymand voluntarily consented to giving both of them, which included the DNA sample contained therein, to law enforcement.  Our case law supports this conclusion despite the fact that Raymand consented to giving the envelope to law enforcement under false pretenses.  Once the State lawfully possessed the envelope and its contents, it was free to develop a DNA profile using the saliva from the envelope and compare that profile to the DNA from the crime

---

[1] Raymand passed away shortly after filing his notice of appeal in this case.  This appeal is not moot, however, because "when a defendant dies while pursuing postconviction relief …, the defendant's right to bring an appeal continues."  *See* **State v. McDonald**, 144 Wis. 2d 531, 532, 424 N.W.2d 411 (1988).

Because this case tangentially involves other members of the Vannieuwenhoven family, including Raymand's brothers, we refer to Raymand using his given name to avoid confusion.

[2] For purposes of this opinion, we refer to Raymand's purported expectation of privacy in his "DNA and the information contained therein" as a reasonable expectation of privacy in his "DNA profile."  In this case, the analysis of Raymand's DNA profile was limited to noncoding DNA.

scene. Under the facts of this case, once Raymand gave control of the envelope and its contents, including his saliva, to law enforcement, he surrendered any reasonable expectation of privacy in the minimally invasive DNA profile developed from that saliva sample, which the State used solely to determine whether his DNA profile matched that from the crime scene.

¶3    Because Raymand did not have a reasonable expectation of privacy in his provided DNA profile under these facts, law enforcement did not conduct an unlawful search in violation of the Fourth Amendment when it extracted and analyzed his DNA. Accordingly, we affirm Raymand's judgment of conviction.

## BACKGROUND

¶4    The State charged Raymand in 2019 with two counts of first-degree murder after collecting, analyzing, and matching his DNA with DNA collected at the scene of an unsolved 1976 double homicide and sexual assault occurring in Marinette County.[3] Raymand filed a motion to suppress the DNA analysis results, arguing that his DNA was unconstitutionally seized and searched.

¶5    At the suppression hearing, the State established that law enforcement was unable to identify any concrete suspects immediately following the double homicide and sexual assault, and the case went unsolved for several decades. Marinette County Sheriff's Department Detective Todd Baldwin testified that during the initial investigation, law enforcement collected semen found at the crime

---

[3] The State also charged Raymand with one count of first-degree sexual assault, which the circuit court dismissed with prejudice as barred by the applicable statute of limitations. *See* WIS. STAT. § 939.74 (1975-76) (establishing a six-year statute of limitations for felonies with no exception for any form of sexual assault).

scene ("1976 sample"). In the early 2000s, with technological advances in DNA analysis, the Wisconsin State Crime Laboratory ("SCL") developed a DNA profile from the 1976 sample. Specifically, a former SCL microbiologist testified at Raymand's jury trial[4] that she developed the DNA profile using "autosomal" STR typing analysis.[5]

¶6 The microbiologist testified that she established an autosomal DNA profile consisting of "core loci"—that is, the locations of particular genetic markers on a chromosome—which, according to the microbiologist, contain "non[]coding DNA," meaning the loci cannot identify phenotypes such as an individual's hair color, eye color, and race. The 1976 sample was retested in 2015 using advanced technology to create two additional loci. A Y chromosome DNA profile was also established. Using a national FBI database, law enforcement unsuccessfully attempted to match the DNA profile with any known individual.

¶7 In 2018, Parabon Nanolab, a company in Virginia that specializes in genetic testing and genealogical research, analyzed the 1976 sample at law enforcement's request and ascertained the suspect's phenotypes (e.g., his skin color, hair color, and an image of what he may look like). Later, a genealogist with

---

[4] An appellate court may consider evidence from a jury trial when reviewing a suppression order. *State v. Gaines*, 197 Wis. 2d 102, 106 n.1, 539 N.W.2d 723 (Ct. App. 1995).

[5] STR stands for short tandem repeat.

A DNA analyst with the SCL testified that the SCL has two different types of DNA testing: "autosomal DNA testing and Y chromosome" testing. The latter involves analyzing the locations of genetic markers on a male individual's Y chromosome—the DNA profile from Y chromosome testing is generally identical for male individuals that are paternally related. Autosomal DNA testing involves analyzing the locations of genetic markers on an individual's "autosomal" chromosomes, or non-sex-determining chromosomes, that are equally but randomly inherited from an individual's mother and father.

Parabon also determined that the DNA likely came from someone within a specific family in the Green Bay area—the family of Gladys and Edward Vannieuwenhoven. Detective Baldwin testified that the genealogist informed him that she believed the suspect was one of the Vannieuwenhovens' four sons or one of the Vannieuwenhovens' four grandsons.

¶8      Detective Baldwin testified that law enforcement attempted to covertly collect DNA from each possible family member so that none of the suspects would alert the other suspected family members.[6]  Baldwin collected saliva from two of the Vannieuwenhovens' sons and forwarded the evidence to the SCL.  An SCL analyst created DNA profiles from the collected saliva and excluded both sons as the source of the 1976 sample.

¶9      After learning that the Vannieuwenhovens' third son had passed away, Detective Baldwin turned his attention to Raymand, the fourth son, who lived in Oconto County.  Baldwin unsuccessfully attempted to collect Raymand's saliva for several weeks.  Eventually, Baldwin contacted Oconto County Sheriff's Office Chief Deputy Darren Laskowski, and together they devised a plan to obtain Raymand's saliva using a ruse.

¶10     As part of the ruse, Chief Deputy Laskowski went to Raymand's residence with a fake survey.  Laskowski knocked on the door, identified himself as law enforcement, and asked Raymand whether he was interested in completing a survey about law enforcement in Oconto County.[7]  Raymand answered in the

---

[6] Law enforcement feared that if the perpetrator was alerted to their investigation, he might attempt to flee or commit suicide.

[7] Chief Deputy Laskowski testified at the suppression hearing that he did not complete the survey with any other individual and that the purpose of the encounter with Raymand was to obtain his DNA.

affirmative and permitted Laskowski to enter his residence. Laskowski informed Raymand that after they completed the survey, "[W]hat I'm going to do is I'm going to ask you to seal the envelope here and then I give it to the sheriff and he reviews them privately, okay?"

¶11 Chief Deputy Laskowski then read questions from the survey, which was four questions long and consisted of inquiries into Raymand's general satisfaction with the Oconto County Sheriff's Office, and filled in Raymand's answers. Upon completing the survey, Laskowski stated to Raymand:

> It's up to you if you want to sign this thing, but the sheriff asked that, you know, these are—this—this survey is important. So what we'll do here is I'll put it in the envelope so these answers can't get changed. Okay? And you seal it. And then we'll sign it.

Laskowski then handed the envelope with the survey inside to Raymand, who took the envelope, sealed it using his saliva, and handed it back to Laskowski.[8]

¶12 Chief Deputy Laskowski returned the sealed envelope to Detective Baldwin, who then sent it to the SCL. A DNA analyst with the SCL testified at the jury trial that she swabbed the envelope for saliva and developed an

---

[8] Chief Deputy Laskowski's interaction with Raymand was captured on an audio recording.

After extracting Raymand's saliva from the envelope and developing a DNA profile, law enforcement obtained a second sample of Raymand's DNA pursuant to a search warrant. From the second sample, the SCL developed both an autosomal DNA profile and a Y chromosome DNA profile, both of which matched the DNA profile from the 1976 sample. Although Raymand does not so expressly argue, we assume he inherently challenges the second sample's collection because the probable cause to collect that sample was partially obtained as a result of the extraction and testing of the first sample.

6

autosomal DNA profile.[9] The analyst then matched the DNA profile from the 1976 sample with the DNA profile obtained from the saliva on the envelope. Specifically, the loci from the saliva sample matched the loci from the 1976 sample.

¶13   After briefing by the parties and the suppression hearing, the circuit court denied Raymand's motion to suppress. The court found that while the survey was a "complete fabrication" and law enforcement had engaged in a "ruse" "designed to obtain" Raymand's DNA, Raymand voluntarily provided the envelope, including his saliva, to Chief Deputy Laskowski, whom Raymand knew was a law enforcement officer. According to the court, because Raymand consented to giving the envelope and his saliva to Laskowski, law enforcement did not need to obtain a search warrant to analyze the saliva and obtain a DNA profile.

¶14   Raymand was found guilty by a jury of both counts of first-degree murder. Raymand now appeals.[10]

## DISCUSSION

¶15   Whether evidence should be suppressed due to a violation of the Fourth Amendment to the United States Constitution is a question of constitutional fact subject to a two-step inquiry.[11] *State v. Wilson*, 2022 WI 77, ¶17, 404 Wis. 2d

---

[9] The DNA analyst testified that she used a different type of autosomal DNA testing for the sample collected from the envelope than that used in 2015 for the crime scene sample and, in doing so, established additional loci.

[10] Raymand filed two petitions for leave to appeal pretrial rulings denying his motions to introduce evidence that two third parties committed the homicides with which he was charged. We denied both petitions. Raymand does not raise any issues on appeal other than the suppression issue.

[11] Generally, we interpret article I, section 11 of the Wisconsin Constitution to provide the same constitutional protections as the Fourth Amendment. *State v. Dearborn*, 2010 WI 84, ¶14, 327 Wis. 2d 252, 786 N.W.2d 97. Raymand does not argue that this principle should not apply here.

623, 982 N.W.2d 67. First, we will uphold a circuit court's findings of historical fact unless they are clearly erroneous. *Id.*, ¶18. "A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." *Id.* Then, we independently apply those factual findings to constitutional principles. *Id.*

¶16    The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. CONST. amend. IV. "An individual's rights under the Fourth Amendment apply where he or she has 'a reasonable expectation of privacy in the property or location.'" *State v. Bowers*, 2023 WI App 4, ¶18, 405 Wis. 2d 716, 985 N.W.2d 123 (2022) (citations omitted).

¶17    Raymand does not argue that law enforcement unlawfully seized the envelope or its contents, including his saliva. Nor does he contend that he had a reasonable expectation of privacy in the DNA profile developed from the 1976 sample or in the envelope that he handed to law enforcement. Instead, he argues that he had a reasonable expectation of privacy in his DNA profile procured from the envelope, even after he handed the envelope and its contents—including his saliva—to law enforcement. According to Raymand, the circuit court erred by denying his motion to suppress because the State conducted two warrantless "searches"—one search occurred when the SCL "extracted [his] saliva and DNA from the envelope" and a second search occurred when the SCL "analyzed the DNA."

¶18    We agree with the parties that law enforcement constitutionally seized the envelope and its contents.  Under these facts, Raymand consensually provided the envelope to Chief Deputy Laskowski.[12]  Consent must be voluntarily given. *State v. Phillips*, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998); *Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973).  The test for voluntariness is whether, under the totality of the circumstances, consent was given in the absence of duress or coercion, either express or implied.  *Phillips*, 218 Wis. 2d at 197-98.

¶19    There is no question that law enforcement engaged in a ruse to obtain Raymand's DNA sample in order to develop a DNA profile and to compare it with the DNA profile from the 1976 sample.  However, law enforcement, "within reasonable bounds, may use misrepresentations, tricks and other methods of deception to obtain evidence." *State v. Albrecht*, 184 Wis. 2d 287, 300, 516 N.W.2d 776 (Ct. App. 1994); *see also State v. Athan*, 158 P.3d 27, 31-32, 37 (Wash. 2007) (holding there was no Fourth Amendment violation where law enforcement developed a defendant's DNA profile using his saliva that was obtained from a fictitious class action lawsuit letter).  Nothing in this case suggests that law enforcement's trickery caused Raymand to nonconsensually give the envelope and its contents away.  Raymand permitted an identified law enforcement officer to enter his home, and Raymand voluntarily licked the envelope and then knowingly provided it directly to law enforcement without any expectation of getting it back. Notably, the officer did not demand that Raymand participate in the survey, nor did

---

[12]  Both parties agree on appeal that consent is not at issue in this case, and they focus their arguments on whether Raymand abandoned the envelope and its contents.  We disagree that an abandonment analysis is appropriate under these facts.  Raymand did not "throw[] … away" the envelope and its contents.  *See Abel v. United States*, 362 U.S. 217, 241 (1960).  The relevant question in this case is whether Raymand voluntarily consented to providing law enforcement with the envelope and its contents.  If he did, the next question becomes whether he retained any privacy interest in the DNA profile that could be found in his saliva on that envelope.

the officer engage in any form of abuse toward Raymand. In other words, Raymand was not coerced or under duress when he gave the envelope to law enforcement.

¶20 We further conclude that after law enforcement lawfully seized the envelope and its contents through Raymand's consent, it was not required to obtain a search warrant to extract and analyze his DNA. Law enforcement's "examination of evidence seized pursuant to the warrant requirement or an exception to the warrant requirement is an essential part of the seizure and does not require a judicially authorized warrant." *State v. VanLaarhoven*, 2001 WI App 275, ¶16, 248 Wis. 2d 881, 637 N.W.2d 411.

¶21 For example, once law enforcement lawfully seizes a blood sample from a defendant via consent, it is permitted to analyze that sample to determine if it contains evidence of a blood alcohol concentration (BAC) in excess of the legal limit. *Id.*, ¶17. The chemical analysis of the blood sample is not a "separate event for warrant requirement purposes." *Id.*; *see also State v. Randall*, 2019 WI 80, ¶¶14, 64, 387 Wis. 2d 744, 930 N.W.2d 223 (concluding, by a two-justice lead opinion and a concurrence by three other justices, that there is no reasonable expectation of privacy in the alcohol concentration of blood that has been lawfully seized);[13] *State v. Petrone*, 161 Wis. 2d 530, 544-45, 468 N.W.2d 676 (1991), *abrogated on other grounds by State v. Greve*, 2004 WI 69, ¶31 & n.7, 272 Wis. 2d 444, 681 N.W.2d 479 (holding that law enforcement "may employ various methods to examine objects lawfully seized in the execution of a warrant").

---

[13] When "a majority of the participating judges … agree[] on a particular point … [that point is] considered the opinion of the court." *State v. Elam*, 195 Wis. 2d 683, 685, 538 N.W.2d 249 (1995).

¶22    In this case, law enforcement was not required to obtain a warrant for each step of the noncoding DNA analysis—i.e., extracting the DNA from the envelope, developing the DNA profile, and then comparing the DNA profile with that developed from the 1976 sample—because the saliva was collected by constitutional means—Raymand voluntarily handed the envelope to law enforcement with his saliva on it—and law enforcement used the sample solely to compare it with the DNA profile from the 1976 sample. *See VanLaarhoven*, 248 Wis. 2d 881, ¶16.

¶23    Furthermore, Raymand did not have a reasonable expectation of privacy in his DNA profile after he gave the envelope and its contents to law enforcement. A defendant who asserts that he or she had a reasonable expectation of privacy in a searched item must establish, by a preponderance of the evidence, "(1) that he or she had an actual, subjective expectation of privacy in the area searched and item seized and (2) that society is willing to recognize the defendant's expectation of privacy as" "objectively reasonable." *See State v. Tentoni*, 2015 WI App 77, ¶¶7-8, 365 Wis. 2d 211, 871 N.W.2d 285.

¶24    Raymand fails to make any direct argument on appeal—much less prove by a preponderance of the evidence—that he had a subjective expectation of privacy in his DNA profile. The State made this point in its brief-in-chief, but Raymand failed to respond to the argument. Thus, we deem the issue conceded. *See United Co-op. v. Frontier FS Co-op.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (stating that a party's failure to refute a proposition asserted in a response brief may be taken as a concession).

¶25    Nevertheless, even if Raymand had shown that he had a subjective expectation of privacy in his DNA profile, he has not shown that his expectation

was objectively reasonable. We consider the following factors when determining whether a defendant's expectation of privacy was objectively reasonable:

> (1) whether the defendant had a property interest in the premises; (2) whether he [or she] was legitimately (lawfully) on the premises; (3) whether he [or she] had complete dominion and control and the right to exclude others; (4) whether he [or she] took precautions customarily taken by those seeking privacy; (5) whether he [or she] put the property to some private use; and (6) whether the claim of privacy is consistent with historical notions of privacy.

*Bowers*, 405 Wis. 2d 716, ¶19 (alterations in original; citation omitted). "'Although these factors guide our analysis, they are not controlling,' and '[w]e consider the totality of the circumstances in determining whether an individual has a reasonable expectation of privacy.'" *Id.* (alteration in original; citation omitted).

¶26 In *Tentoni*, we examined the second, objective prong where a defendant asserted that he had a reasonable expectation of privacy in text messages he sent to another person which were obtained by law enforcement through a search of the other person's cell phone. *Tentoni*, 365 Wis. 2d 211, ¶¶3-5. We concluded that the defendant's expectation of privacy was not objectively reasonable. In doing so, we determined that the defendant: had no property interest in the other person's cell phone; had no control over the other person's cell phone or any right to exclude others from the text messages that the defendant had sent; and did not take any steps to enhance his privacy, such as telling the other person to keep the text messages private. *Id.*, ¶8. We reasoned that once the defendant had sent the text messages, he "had no control over whether [the other person] saved them, deleted them, forwarded them to others or shared their content in any way." *Id.*, ¶11. We further concluded:

> This lack of control over what is done with the text message[s] and lack of any right to exclude others from

12

reading [them] are key in the determination that [the defendant] did not have an objectively reasonable expectation of privacy in the text messages stored in [the other person's cell] phone.

*Id.*

¶27     Similar to the defendant's relinquishment of the text messages in *Tentoni*, Raymand cannot be said to have maintained an objectively reasonable expectation of privacy in his DNA profile because he lost any expectation of privacy in the profile once law enforcement lawfully obtained the envelope including the saliva.  Raymand had no property interest in the DNA sample because he voluntarily gave the envelope and its contents to law enforcement; he had no control over what law enforcement did with the DNA sample; and he did not take any steps to enhance his privacy in the DNA sample.

¶28     Raymand does not attempt to argue that any of the factors outlined in *Bowers* weigh in favor of him having an objectively reasonable expectation of privacy in his DNA profile.  Instead, he argues that the holdings in *Tentoni* and *VanLaarhoven* should not apply to this case because a "physical item whose evidentiary value was apparent on its face can now offer police a portal into one's most private details."  In making this argument, Raymand attempts to liken this case to *Riley v. California*, 573 U.S. 373, 403 (2014), in which the United States Supreme Court held that law enforcement needed a warrant to search a cell phone that was seized following a search of the cell phone's owner incident to a lawful arrest.  By analogy to *Riley*, Raymand contends that law enforcement should be required to obtain a search warrant to extract and analyze DNA from a sample, even if that sample was lawfully obtained.

¶29     This argument is unpersuasive because the Court in **Riley** did not hold that law enforcement is always required to obtain a warrant to search a cell phone, as Raymand suggests.  While the Court determined that a warrant is required to search a cell phone that was lawfully seized during a search of the cell phone's owner incident to a lawful arrest, the Court specifically noted that other exceptions to the Fourth Amendment could apply.  *Id.* at 388.  Ostensibly, a search warrant is not required when law enforcement searches a cell phone following the owner's consent.  *See **United States v. Thurman***, 889 F.3d 356, 366 & n.9 (7th Cir. 2018) (holding that **Riley** does not alter the consent analysis for cell phone searches).

¶30     We are cognizant of the fact that, like cell phone searches and blood testing for alcohol concentration, DNA testing "has the potential to reveal a vast amount of personal information, including medical conditions and familial relations."     *See* Albert E. Scherr, *Genetic Privacy & the Fourth Amendment:  Unregulated Surreptitious DNA Harvesting*, 47 GA. L. REV. 445, 458 (2013); **Riley**, 573 U.S. at 395 (discussing the "element of pervasiveness that characterizes cell phones but not physical records"); **Birchfield v. North Dakota**, 579 U.S. 438, 464 (2016) ("[A] blood test, unlike a breath test, places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading.").

¶31     However, like blood testing for alcohol concentration, the State in this case did not conduct an extensive analysis of Raymand's DNA sample, and the privacy concerns espoused in **Riley** are not at issue under these facts.  The SCL analyzed Raymand's saliva for noncoding DNA—i.e., DNA not related to Raymand's race, hair color, or other phenotypes—and, therefore, the analysis did

not reveal a vast amount of personal information about Raymand.[14] *Cf. Riley*, 573 U.S. at 395 (stating that an unlimited search of a cell phone can reveal "a digital record of nearly every aspect of [an individual's life]—from the mundane to the intimate"). Specifically, the SCL extracted the DNA from the sample that was lawfully in its possession and then created a DNA profile by determining the noncoding core loci. *See Maryland v. King*, 569 U.S. 435, 464-65 (2013) (concluding that "noncoding parts of the DNA … do not reveal the genetic traits of the arrestee" and the testing of that noncoding DNA does "not amount to a significant invasion of privacy").[15] The only purpose for analyzing Raymand's DNA was to compare the loci with those of the DNA profile from the 1976 sample.

---

[14] Raymand contends that we cannot know for certain whether the SCL tested his saliva for coding DNA because it was the former SCL microbiologist who testified that she conducted a noncoding DNA analysis on the sample taken from the crime scene. Raymand points out that the DNA analyst did not specifically state that the test on Raymand's saliva was for noncoding DNA. However, the noncoding core loci from the DNA profile obtained from the 1976 sample were matched with the same loci from Raymand's DNA profile. In other words, the DNA was matched using a noncoding DNA analysis. While there are additional loci present in Raymand's DNA profile, there is nothing in the record to suggest that the additional loci are anything but noncoding related, or that the SCL or law enforcement tested or analyzed Raymand's saliva for coding DNA.

Raymand also argues that the DNA analysis of his saliva was not isolated to noncoding DNA because the SCL "isolated [his] DNA by swabbing the seal of the envelope and … developed an 'autosomal DNA profile.'" Raymand fails to comprehend the meaning of autosomal DNA testing and the process for DNA analysis used in this case. *See supra* note 5. Both the crime scene DNA profile and Raymand's DNA profile from the saliva were analyzed by "isolating" the DNA. Further, both samples were subject to autosomal DNA testing, which, in this case, involved an analysis of noncoding DNA.

[15] Other jurisdictions have reached the same conclusion we have in this case, holding that an individual does not have a reasonable expectation of privacy in his or her noncoding DNA profile that is lawfully possessed by law enforcement and that is analyzed solely for the purpose of comparing it with that from a crime scene. *See, e.g.*, *Varriale v. State*, 96 A.3d 793, 797 (Md. Ct. Spec. App. 2014); *Commonwealth v. Ewing*, 854 N.E.2d 993, 1000-01 (Mass. App. Ct. 2006); *Washington v. Athan*, 158 P.3d 27, 37 (Wash. 2007); *Parisi v. Artus*, No. 08-CV-1785, 2010 WL 4961746, at *6-7 (E.D.N.Y. Dec. 1, 2010); *United States v. Green*, No. 09-00139-01-CR-W-DGK, 2010 WL 5502347, at *7 (W.D. Mo. Dec. 14, 2010).

¶32 In support of his position that law enforcement violated the Fourth Amendment by extracting and analyzing his DNA, Raymand cites *United States v. Davis*, 690 F.3d 226 (4th Cir. 2012), and *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602 (1989). As an initial matter, we are not bound by the holding in *Davis*. *See City of Weyauwega v. Wisconsin Cent. Ltd.*, 2018 WI App 65, ¶12 n.4, 384 Wis. 2d 382, 919 N.W.2d 609 ("Although federal court decisions, other than United States Supreme Court decisions on questions of federal law, do not bind us, we may follow federal court decisions that we find persuasive."). Regardless, *Davis* is materially distinguishable from this case because the United States Court of Appeals for the Fourth Circuit was not presented with the issue of consent. *See Davis*, 690 F.3d at 265. Instead, the court considered whether law enforcement lawfully tested the defendant's blood-stained clothing from an earlier incident in which the defendant was the victim of a shooting. *Id.* at 230-33. We are therefore unpersuaded by *Davis* and its application to the facts of this case.

¶33 *Skinner* is similarly distinguishable because it dealt with a challenge to the manner in which the government collected blood and urine samples rather than the manner in which the government tested or analyzed a DNA sample once it was lawfully obtained. *See Skinner*, 489 U.S. at 617-18. Here, law enforcement lawfully seized Raymand's DNA sample, which permitted law enforcement to analyze it for noncoding DNA. *See VanLaarhoven*, 248 Wis. 2d 881, ¶16; *Tentoni*, 365 Wis. 2d 211, ¶¶8, 11.

¶34 In all, Raymand consensually provided law enforcement with the envelope and its contents, including his saliva. Once law enforcement lawfully possessed those items, it was free to develop a DNA profile using the saliva and compare that profile to the DNA profile from the 1976 sample. Notably, the DNA from the envelope was extracted and analyzed for noncoding DNA to create a

profile that was then used only to determine if it matched the DNA profile from the 1976 sample. Under these circumstances, Raymand did not have a reasonable expectation of privacy in his DNA profile after he voluntarily gave the envelope and its contents to law enforcement. We therefore conclude that the circuit court did not err by denying Raymand's motion to suppress, and we affirm his judgment of conviction.

*By the Court.*—Judgment affirmed.